## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>CITIGROUP GLOBAL MARKETS INC.,<br><br>    Defendant. | MEMORANDUM BY PLAINTIFF SECURITIES AND EXCHANGE COMMISSION IN SUPPORT OF PROPOSED SETTLEMENT<br><br>11 CV ( )<br>ECF CASE **11 CIV 7388** |

Plaintiff Securities and Exchange Commission submits the following memorandum in support of the proposed consent judgment with Citigroup Global Markets Inc. ("Citigroup"). For the reasons set forth below, the Commission respectfully submits that the consent judgment is fair, adequate, reasonable and in the public interest. The judgment should therefore be entered.

**A.    The Commission's Complaint**

In its Complaint, the Commission alleges that defendant Citigroup engaged in fraud in connection with the structuring and marketing of a largely synthetic collateralized debt obligation ("CDO") called Class V Funding III ("Class V III"). The investment portfolio for Class V III consisted primarily of credit default swaps ("CDS") referencing other CDO securities with collateral consisting primarily of subprime residential mortgage-backed securities ("RMBS"). As a result, the value of Class V III and its underlying investment portfolio was tied to the United States residential housing market. Citigroup structured and marketed this $1 billion "CDO-squared" in early 2007 when the U.S. housing market and securities linked to the U.S. housing market were already beginning to show signs of distress.

Citigroup's marketing materials for Class V III – including a pitch book and offering circular – represented that the investment portfolio was selected by Credit Suisse Alternative Capital, Inc. ("CSAC"), a registered investment adviser that was promoted as having experience and expertise in analyzing credit risk in CDOs, using an extensively described asset selection process. The marketing materials failed to disclose to investors that Citigroup had exercised significant influence over the selection of $500 million of the assets in the Class V III investment portfolio, and that Citigroup had retained a short position in those assets. Citigroup established its short position by entering into CDS on assets that it helped select for Class V III. By taking a short position with respect to the assets that it had helped select, Citigroup profited from the poor performance of those assets, while investors in Class V III suffered losses. The CDO securities on which Citigroup bought protection had a notional value of approximately $500 million, representing half of the Class V III investment portfolio. The marketing materials Citigroup prepared and distributed to investors did not disclose Citigroup's role in selecting assets for Class V III and did not accurately disclose to investors Citigroup's short position on those assets.

Class V III closed on February 28, 2007. At closing, Citigroup was paid approximately $34 million in fees for structuring and marketing Class V III. On or about that date and in the following weeks, Citigroup sold approximately $343 million of Class V III equity and mezzanine liabilities ("notes") to approximately fourteen (14) institutional investors ("Subordinate Investors"), all of whom received some or all of the marketing materials for Class V III. The Subordinate Investors included hedge funds, investment managers and other CDO vehicles. On or about March 16, 2007, Ambac Credit Products ("Ambac"), an affiliate of Ambac Assurance Corporation, a monoline insurance company, agreed to sell protection to an affiliate of Citigroup on the $500 million super senior tranche of Class V III, meaning that Ambac effectively invested

in that tranche by assuming the credit risk associated with that portion of the capital structure via CDS in exchange for premium payments.  The transaction with Ambac was intermediated by BNP Paribas ("BNP"), a European financial institution (together with Ambac, the "Super Senior Investors").  Citigroup provided the marketing materials for Class V III to Ambac and BNP in connection with their decision to sell protection on the super senior tranche of Class V III.

By November 6, 2007, approximately 83% of the CDOs in the Class V III investment portfolio had been downgraded by rating agencies.  Class V III declared an event of default on November 19, 2007.  As a result of the poor performance of the investment portfolio, the Subordinate Investors and Super Senior Investors lost several hundred million dollars.  Through its fees and its short positions, Citigroup realized net profits of at least $160 million in connection with Class V III.

The Commission alleges that Citigroup violated Sections 17(a)(2) and (3) of the Securities Act of 1933 [15 U.S.C. §§77q(a)(2) and (3)] ("Securities Act") by negligently misrepresenting key deal terms, namely the process by which the investment portfolio was selected and Citigroup's financial interest in the transaction.

**B.    The Proposed Judgment**

Under the terms of the proposed judgment, Citigroup would be (1) enjoined from future violations of Sections 17(a)(2) and (3) of the Securities Act; (2) ordered to pay disgorgement in the amount of $160 million, together with $30 million in prejudgment interest, and a civil penalty in the amount of $95 million; and (3) ordered to comply with undertakings for a period of three years regarding the review and approval process for offerings of CDOs and other residential mortgage-related securities.  The SEC may by motion propose a plan to distribute the funds subject to the Court's approval.  Such a plan may provide that the funds be distributed

pursuant to the Fair Fund provisions of Section 308(A) of the Sarbanes-Oxley Act of 2002.

Citigroup's settlement would be on a neither admit nor deny basis.

### C.   Related Proceedings

Contemporaneously with the current action, the Commission has also filed a civil

complaint against Brian H. Stoker, a former employee of Citigroup. *SEC v. Stoker*, No. 11-CV-

_____ (S.D.N.Y.). The SEC charged Stoker with violating Securities Act Sections 17(a)(2) and

(3) in connection with his involvement in the structuring and marketing of the Class V III CDO.

The Commission also instituted settled public administrative and cease and desist

proceedings against CSAC and a former employee, Samir H. Bhatt,  pursuant to Section 8A of

the Securities Act and Sections 203(e), 203(f) and 203(k) of the Investment Advisers Act of 1940

("Advisers Act").   In those proceeding, CSAC has consented to the entry of an administrative

order requiring it to cease and desist from committing or causing violations or future violations

of Securities Act Section 17(a)(2) and Advisers Act Section 206(2) and to pay $2.5 million, and

Bhatt has consented to the entry of an administrative order requiring him to cease and desist from

committing or causing violations or future violations of Securities Act Section 17(a)(2) and

Advisers Act Section 206(2) and to pay $50,000 and imposing a six month industry suspension.

### E.   The Standard Governing Judicial Review of Proposed Commission Settlements Is Whether the Proposed Settlement Is Fair, Adequate, Reasonable, and in the Public Interest.

The standard for judicial review and approval of proposed consent judgments in

Commission enforcement actions is whether they serve "the public interest." *SEC v. Randolph*,

736 F.2d 525, 529 (9th Cir. 1984), s*ee also United States v. Trucking Emp., Inc.*, 561 F.2d 313,

317 (D.C. Cir. 1977) ("prior to approving a consent decree a court must satisfy itself of the

settlement's overall fairness to beneficiaries and consistency with the public interest") (citations

and internal quotations omitted).   To ensure that the public interest is served, the court "need not

inquire into the precise legal rights of the parties nor reach and resolve the merits of the claims or

controversy, but need only determine that the settlement is fair, adequate, reasonable and

appropriate under the particular facts and that there has been valid consent by the parties."

*Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1126 (D.C. Cir. 1983) (citations omitted).

Stated another way, "[t]his Court has the obligation, within carefully prescribed limits, to

determine whether the proposed Consent Judgment settling [a] case is fair, reasonable, adequate,

and in the public interest."  *SEC v. Bank of America Corp.*, No. 09-CV-6829 (JSR), 2009 WL

2842940, at *1 (S.D.N.Y. Aug. 25, 2009).  In making this assessment, "the law requires the

Court to give substantial deference to the SEC as the regulatory body having primary

responsibility for policing the securities markets, especially with respect to matters of

transparency."  *SEC v. Bank of America Corp.*, Nos. 09 Civ. 6829 (JSR), 10 Civ. 0215 (JSR),

2010 WL 624581, at *6 (S.D.N.Y. Feb. 22, 2010).

In evaluating the reasonableness of a Commission settlement that includes a proposed

penalty, a court should be satisfied that the penalty reflects an adequate consideration of relevant

penalty factors.  *See SEC v. Worldcom, Inc.*, 273 F. Supp. 2d 431, 434-436 (S.D.N.Y. 2003).  In

*Statement of the Securities and Exchange Commission Concerning Financial Penalties* ("Penalty

Statement"), SEC Rel. No. 2006-04 (Jan. 4, 2006), the Commission identified the following nine

factors relevant to the assessment of whether to impose penalties against a corporation and, if so,

in what amount: (i) corporate benefits from the violation; (ii) impact on injured investors and

current shareholders; (iii) need for deterrence; (iv) pervasiveness of the conduct; (v) degree of

scienter; (vi) extent of the harm to investors; (vii) difficulty of detecting the violations; (viii)

voluntary remedial measures; and (ix) extent of the cooperation, if any, with the Commission and

other law enforcement agencies. *See also Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934 and Commission Statement on the Relationship of Cooperation to Agency Enforcement Decisions*, SEC Rel. No. 44969 (Oct. 23, 2001). When applying the penalty factors to a specific case, the Commission attempts to assess the extent of the sanction that will best serve the interests of investors and the public while maintaining consistency with penalty amounts previously imposed in similar cases.

**F.    The Commission's Proposed Settlement with Citigroup Is Fair, Appropriate, Reasonable and in the Public Interest.**

The Commission believes that the proposed settlement in this case represents a fair and reasonable resolution of the Commission's claims. The disgorgement called for in the proposed settlement is appropriate. Through its fees and its short positions, Citigroup realized net profits of at least $160 million in connection with Class V III. These pecuniary gains were causally connected to the securities law violations because Citigroup would not have received them had the transaction not closed and doing so required misrepresenting two key deal terms: the process by which the investment portfolio was selected and Citigroup's financial interest in the transaction.

The misconduct at issue was serious and deserving of a substantial penalty. The proposed $95 million civil penalty will serve as an appropriate deterrent to Citigroup and other Wall Street firms from using false and misleading statements in connection with the marketing of structured products. The money received can be returned to investors with the Court's approval pursuant to the Fair Fund provisions of Section 308(A) of the Sarbanes-Oxley Act of 2002. Although the recommended penalty is significant, the penalty is being paid by Citigroup, the entity to that profited from the misconduct, and will not be felt, directly or indirectly, by the investors in Class V III that were victimized by Citigroup's misconduct.

Citigroup has offered to consent to remedial undertakings for a period of three years.  The undertakings relate to control weaknesses that contributed to the misstatements and omissions in the marketing materials for Class V III.  The undertakings are narrowly tailored to the violations and represent appropriate remedial relief.

For the foregoing reasons, the Commission submits that the proposed consent judgment is fair, adequate, reasonable, and in the public interest.  It should be entered by this Court.


Dated:  Washington, D.C.
        October ____ , 2011                      Respectfully submitted,

                                                 *Reid A. Muoio*

| | Kenneth Lench |
| | Reid A. Muoio (RM-2274) |
| | Andrew Feller |
| | Thomas Silverstein |
| | |
| | Jeffrey Infelise |
| | |
| | Attorneys for Plaintiff |
| | Securities and Exchange Commission |
| | 100 F St., NE |
| | Washington, D.C. 20549-4010 |
| | (202)551-4904 (Infelise) |
| | infelisej@sec.gov |