UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| U. S. SECURITIES AND EXCHANGE COMMISSION, | : | MEMORANDUM OF LAW IN SUPPORT OF MOTION TO INTERVENE |
| Plaintiff, | : | |
| v. | : | CIVIL ACTION NO. 1:11-cv-07387-JSR |
| CITIGROUP GLOBAL MARKETS INC., | : | |
| Defendant, | : | JUDGE JED S. RAKOFF |
| BETTER MARKETS, INC., | : | ECF CASE |
| Movant Seeking Intervention | : | |

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................ii

TABLE OF AUTHORITIES.........................................................................iii

I.   INTRODUCTION................................................................................1

II.  BETTER MARKETS.............................................................................3

III. FACTUAL BACKGROUND.................................................................6

IV. ARGUMENT.........................................................................................6

    A.  Better Markets is entitled to intervention as of right. ................................6

        1.   The Motion is timely.................................................................7

        2.   Better Markets has a direct, substantial, and legally protectable interest in this case....................................................................8

        3.   Better Markets is so situated that disposing of the action may as a practical matter impair or impede its ability to protect its interest.....................13

        4.   The existing parties to this case do not adequately represent the interests of Better Markets...............................................................14

    B.  Better Markets also satisfies the conditions for permissive intervention...........19

        1.   The Motion to Intervene is timely and the claim of Better Markets shares common questions of law or fact with the main action......................20

        2.   Intervention by better Markets will not unduly delay or prejudice the adjudication of the original parties' rights. ..................................20

        3.   Other factors weigh in favor of permissive intervention....................

CONCLUSION.........................................................................................24

## TABLE OF AUTHORITIES

**CASES**

*Butler, Fitzgerald & Potter v. Sequa Corp.,* 250 F. 3d 171 (2d Cir. 2001)...........................15

*Cascade Natural Gas Corp. v. El Paso Natural Gas Co.,* 386 U.S. 129 (196)...10, 11,13, 19, 20

*Coalition of Arizona/New Mexico Counties for Stable Economic Growth v. Dep't of the Interior* 100 F. 3d 837 (10th Cir. 1996)...........................................................................................12

*Great Atlantic & Pacific Tea Co., Inc. v. Town of East Hampton* 178 F.R.D. 39 (E.D.N.Y. 1998)...........................................................................................................................12

*H.L. Hayden Co. v. Siemens Medical Systems, Inc.,* 797 F. 2d 85 (2d Cir. 1986)...........21, 24

*New York News, Inc. v. Kheel,* 972 F. 2d 482 (2d Cir. 1992)...........................................11

*New York v. Atlantic States Marine Fisheries Comm'n,* 609 F.3d 524 (2d Cir. 2010).............10

*New York v. Gutierrez,* 2008 U.S. Dist. LEXIS 94779, at *16-17 (E.D.N.Y. 2008), *rev'd on other grounds, New York v. Atlantic States Marine Fisheries Comm'n,* 609 F.3d 524 (2d Cir. 2010)..12

*SEC v. Bank of America Corp.,* 653 F. Supp. 2d 507 (S.D.N.Y. 2009)........................1, 16, 17

*SEC v. Bear Stearns & Co.,* 2003 U.S. Dist. LEXIS 14611 at *8(S.D.N.Y. 2003)...............23

*SEC v. Canadian Javelin Limited,* 64 F.R.D. 648 (S.D.N.Y. 1974)...............................15

*SEC v. Credit Bancorp, Ltd,* 194 F.R.D 457 (S.D.N.Y. 2000)......................................8, 15

*SEC v. Euro Security Fund,* 2006 U.S. Dist. LEXIS 34133 (S.D.N.Y. 2006)........................9

*SEC v. Everest Management Corp.,* 475 F. 2d 1236 (2d Cir. 1972)...............................22, 23

*SEC v. Flight Transport Corp.,* 699 F.2d 943 (8th Cir. 1983)..................................7, 14

*SEC v. Navin,* 166 F.R.D. 435 (N.D. Cal. 1995)....................................................14

*SEC v. Stoker,* Civil Action No. 11-CV-7388 (S.D.N.Y. Oct. 19, 2011).............................2

*SEC v. Vitesse Semiconductor Corp.,* 771 F. Supp. 2d 304 (S.D.N.Y. 2011)...............2, 14, 17

*SEC v. Wozniak,* 1993 U.S. Dist. Lexis 1241 (N.D. Ill. Feb. 8, 1993)................................8

*United States v. Hooker Chemicals & Plastics Corp.,* 749 F. 2d 968(2d Cir. 1984)........8, 15, 19

*United States v. Pitney Bowes, Inc.,* 25 F. 3d 66 (2d Cir. 1994)...........................7, 9, 21, 22

**STATUTES AND RULES**

15 U.S.C. § 78u(g)……………………………………………………………………...8

Dodd-Frank Wall Street Reform and Consumer Protection Act…………………………………3

Fed. R. Civ. P. 24……………………………………………………………….......*Passim*

**OTHER AUTHORITIES**

Comment Letter from Better Markets to the Commodity Futures Trading Commission, "Position

Limits for Derivatives" (Mar. 28, 2011)…………………………………………………….5

*Commodity Index Traders and the Boom/Bust Cycle in Commodities Prices*, Better Markets,

(Oct. 14, 2011)………………………………………………………………………….5

Danne L. Johnson, *SEC Settlement: Agency Self-Interest or Public Interest,* 12 FORDHAM J.
CORP. & FIN. L. 627 (2007)……………………….………..……………………………..15

Jonathan Weil. *Citigroup Finds Obeying the Law Too Darn Hard*, Bloomberg (Nov. 2. 2011)…2

Order of October 27, 2011 (J. Rakoff.)………………………………………………...14, 16

*SEC Charges Stemming From the Financial Crisis.* on SEC Website……………..………...18

SEC Litigation Release 2011-214 (Oct. 19, 2011)……………………………………………..8

Better Markets, Inc., ("Better Markets") respectfully submits this memorandum of law in support of the accompanying Motion to Intervene ("Motion").

## I.  INTRODUCTION

Better Markets seeks to intervene in this case under Rule 24 of the Federal Rules of Civil Procedure, Fed. R. Civ. P. 24 ("Rule 24"), for the limited purpose of objecting to the Proposed Settlement that plaintiff Securities and Exchange Commission ("SEC") and defendant Citigroup Global Markets Inc. (with certain affiliates, "Citigroup") have agreed to and submitted to the Court for approval.  Better Markets is a non-profit organization that promotes the public interest in the financial markets, and it was founded to increase transparency, accountability, and oversight in those markets.   In its current form, the Proposed Settlement will undermine all of these goals, and Better Markets therefore has a direct interest in the outcome of this case.

Moreover, as explained in greater detail in the accompanying Opposition (Exhibit 1 to the Motion), the SEC has not, is not and will not adequately represent the public interest.  In fact, the SEC has institutional and other interests that are in conflict with the public interest, which risks not be protected unless Better Markets is allowed to intervene.  This is made clear by, among other things, recent revelations of information material to the Proposed Settlement which the SEC has not brought to the attention of the court, including the SEC's history of sanctioning Citigroup for securities fraud violations to no apparent effect and Citigroup's claim that the Proposed Settlement purportedly for this one CDO deal in fact is ending the SEC's investigation of all of Citigroup's CDO deals which exceed $145 billion.  (See Exhibits A, B and C hereto)

The SEC's Proposed Settlement also utterly fails to provide virtually any information about the fraudulent conduct at issue, the role of individual participants in the fraud, the ill-gotten gains received by Citigroup, the losses suffered by investors, and the justification for the

1

light sanctions imposed relative to the serious misconduct alleged. It further allows Citigroup to resolve serious violations of the securities laws without admitting or denying the allegations in the Complaint.[1] This Court and the investing public are thus left to wonder what really transpired in this case and what level of culpability should be assigned to Citigroup. *See SEC v. Bank of America,* 653 F. Supp. 2d 507, 508 (S.D.N.Y. 2009) (articulating standard of review and disapproving proposed consent judgment); *SEC v. Vitesse Semiconductor Corp.,* 771 F. Supp. 2d 304, 309 (S.D.N.Y. 2011) (criticizing SEC practice of entering settlements without admissions as a "palpable" disservice to the public, but accepting settlement based on admissions in parallel criminal proceeding).

Furthermore, even the limited disclosure in this case, read in conjunction with the documents filed in the related injunctive and administrative actions, shows that the terms of the Proposed Settlement are unacceptable. It fails to hold any employees or senior executives of Citigroup accountable,[2] and as to defendant Citigroup itself, it imposes sanctions that are woefully inadequate in relation to the egregious nature of the fraudulent conduct alleged, the enormous benefits that Citigroup derived, and the scope of the harm done to investors. The Proposed Settlement cannot do justice in this case, nor can it possibly serve as a meaningful deterrent against future misconduct by Citigroup or any other major market participant. On the contrary, the Proposed Settlement will signal an unacceptable tolerance for fraudulent conduct in the securities markets, and it will confirm that sanctions imposed in SEC enforcement actions are

---

[1]   The Consent is actually more favorable to Citigroup than the "without admitting or denying" clause in paragraph 2 would suggest. Elsewhere, the Consent expressly states that it does **not** affect Citigroup's right to take any legal or factual positions in any litigation or other legal proceedings to which the Commission is not a party. *See* Consent of Defendant Citigroup Global Markets Inc., at Para. 14.
[2]   The SEC has filed an enforcement action against only one employee of Citigroup in connection with the violations described in the Proposed Settlement. *See SEC v. Stoker,* Civil Action No. 11-CV-7388 (S.D.N.Y. Oct. 19, 2011).

so minimal that they may safely be regarded as a cost of doing business—and a small cost at that.

Recent revelations confirm that the Proposed Settlement suffers from an indefensible lack of information and transparency as well as an inability to deter Citigroup from further misconduct. *See* Jonathan Weil, *Citigroup Finds Obeying the Law Too Darn Hard*, Bloomberg (Nov. 2. 2011). Citigroup reportedly has repeatedly violated the securities laws over the years and it has been repeatedly sanctioned by the SEC for those violations. However, the reported punishments, from injunctions to cease and desist orders, appear to have had little if any impact on Citigroup's behavior. Now they have violated the law yet again but will receive another apparently meaningless sanction from the SEC, which seems to have ignored Citigroup's recidivist history when setting the penalties in the Proposed Settlement.

This information, just disclosed by an enterprising columnist, is uniquely within the knowledge of the SEC, as it concerns the SEC's own conduct in sanctioning the very defendant before this Court, as recently as 2008. Yet, the SEC failed to bring any of this to the attention of this Court. It cannot be disputed that Citigroup's history of repeated violations and serial "sanctions" bears directly on whether this Proposed Settlement is fair, adequate, reasonable, and in the public interest. If, for example, five prior sanctions in the last eight years have been ineffective in changing what appears to be Citigroup's propensity to violate the laws, then any new violations such as those alleged in the Complaint warrant the imposition of truly weighty punishments. That has not happened here.

In short, the Proposed Settlement is not in the public interest and it will significantly undermine transparency, accountability, and oversight in the financial markets, thus harming the very interests that Better Markets was established to serve.

Moreover, the interests of Better Markets in this matter are not being adequately represented by the existing parties. Citigroup certainly and obviously will not safeguard the public interest, as it seeks to minimize its liability (as is its right). Furthermore, the record in this case illustrates that the SEC has failed to pursue enforcement remedies that are sufficiently strong to punish and deter fraudulent conduct. The extremely serious allegations in the Complaint are irreconcilable with the weak sanctions that would be imposed under the Proposed Settlement. In addition, the SEC's failure to provide a full and complete account of the underlying facts and the basis for the settlement is contrary to the public interest.

Finally, the intervention of Better Markets will not unduly delay or prejudice the adjudication of the original parties' rights. Better Markets seeks intervention not as an injured investor attempting to recover damages on individualized facts, but as a public interest advocate and for the very limited purpose of challenging the Proposed Settlement as not fair, reasonable, adequate, or in the public interest. In that role as an unconflicted and independent party, it can provide the Court with additional facts and analysis that are critically necessary to reach a just and equitable adjudication of the questions presented by the Proposed Settlement.

To help ensure that its interests are adequately protected in this matter, and for the reasons explained in more detail below, Better Markets should be granted leave to intervene under Rule 24 as a matter of right, or in the alternative, as a matter of permissive intervention, for the limited purpose of protecting the public interest and objecting to the Proposed Settlement.

## II. **BETTER MARKETS**

Better Markets is a non-profit organization that promotes the public interest in the financial markets. Better Markets advocates for greater transparency, accountability, and oversight in our financial system through a variety of activities, including regulatory comment,

public advocacy, and independent research. When necessary and appropriate, Better Markets also will seek to advance its goals in court proceedings, including cases involving the validity of agency rulemakings.  In addition, in rare and exceptional circumstances such as this, Better Markets will seek a limited role in significant cases involving the enforcement of the securities laws against market participants who commit fraud and abuse—but only reluctantly and only when the public interest is severely undermined.

Better Markets has focused primarily on the regulatory process implementing the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act").  Better Markets has submitted over 70 comment letters on rules proposed by financial market regulators, including the SEC, the Commodity Futures Trading Commission, the Federal Deposit Insurance Corporation, the Federal Reserve Board, the Financial Stability Oversight Counsel, and the Treasury Department.  In those letters, Better Markets has consistently argued for the imposition of strong, clear, and enforceable standards that will promote transparency, accountability, and oversight in the financial markets. *See generally* Comment Letters submitted by Better Markets to financial regulators.[3]

Better Markets has also participated extensively in the public policy debates over financial market regulation through media appearances, testimony, agency roundtables, press releases, and similar activities.  The President and CEO of Better Markets, Dennis M. Kelleher, as well as specialists on staff, are frequently sought after by the media for comment on financial reform matters.

Better Markets also partners with leading academics and universities, and conducts its own original research and analysis, to develop new thinking about optimal strategies for

---

[3]   *Available at* www.bettermarkets.com.

organizing and regulating our financial markets so that they serve the public interest. For example, Better Markets recently completed and released new research that analyzed the last 27 years of commodity market activity. *See Commodity Index Traders and the Boom/Bust Cycle in Commodities Prices*, Better Markets (Oct. 14, 2011).[4] The data shows that trading by commodity index funds every month has severely disrupted and dramatically changed the commodity markets, causing prices to swing erratically up and down, hedging costs for businesses to rise, and food and fuel prices to increase. The analysis provides strong support for the comment letter that Better Markets submitted to the CFTC in March of this year, calling for a ban on the commodity index funds that engage in this disruptive speculative trading. *See* Comment Letter from Better Markets to the Commodity Futures Trading Commission, "Position Limits for Derivatives" (Mar. 28, 2011).[5]

As the rules promulgated under the Dodd-Frank Act become final, opponents of regulatory reform can be expected to file legal challenges under the Administrative Procedures Act in an effort to invalidate those rules. Better Markets intends to participate in those cases as part of its overall mission to defend the financial reform process and to promote transparency, accountability, and oversight in the financial markets.

The mission of Better Markets necessarily includes advocating for strong enforcement of financial laws and regulations. Even the best regulatory framework can do little to ensure transparency, accountability, and oversight in our financial markets if regulators do not bring strong enforcement actions that include all culpable parties and impose sanctions that are appropriate and commensurate with the violations committed.

---

[4]  *Available at* http://www.bettermarkets.com/sites/default/files/BM%20Report%20CIT%20FINAL.pdf.
[5] *Available at* http://www.bettermarkets.com/sites/default/files/CFTC-%20Comment%20Letter-%20Position%20Limits%203-28-11_0.pdf.

Finally, Better Markets is led and staffed by highly experienced professionals. For example, the President and CEO of Better Markets, Dennis M. Kelleher, served for almost a decade in senior positions in the United States Senate, including as Chief Counsel and Senior Leadership Advisor to the Chairman of a Policy Committee, as a Deputy Staff Director and General Counsel for a Senate Committee, and as a Legislative Director for a senior Senator. In addition, he was a litigation associate and then partner for 18 years at Skadden, Arps, Slate, Meagher & Flom. Stephen Hall, a Securities Specialist for Better Markets, has served with the Enforcement Division of the Commodity Futures Trading Commission, in private practice, with the national association of state securities regulators, and with the House Financial Services Committee during the Conference Committee deliberations on the Dodd-Frank Act. These and other staff members are capable of bringing valuable expertise to their advocacy on behalf of Better Markets and the public interest.

## III.  ARGUMENT

Better Markets should be granted leave to intervene in this case under Rule 24 as a matter of right, or in the alternative, as a matter of permissive intervention. Better Markets satisfies all of the requirements set forth in Rule 24. Moreover, the participation of Better Markets for the limited purpose of challenging the Proposed Settlement on specific and concrete grounds will serve the underlying purposes of the intervention rule: "efficiently administering legal disputes by resolving all related issues in one lawsuit, on the one hand, and keeping a single lawsuit from becoming unnecessarily complex, unwieldy or prolonged, on the other hand." *United States v. Pitney Bowes, Inc.,* 25 F. 3d 66, 69 (2d Cir. 1994).

## A.  BETTER MARKETS IS ENTITLED TO INTERVENTION AS OF RIGHT.

A court must permit intervention under Rule 24(a) whenever the following conditions are met: (1) a timely motion is filed; (2) the person seeking intervention claims an interest relating to the property or transaction that is the subject of the action; (3) the movant is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest; and (4) existing parties do not adequately represent that interest. Fed. R. Civ. P. 24(a)(2).[6]

The Second Circuit views these requirements as "a nontechnical directive to courts that provides the flexibility necessary 'to cover the multitude of possible intervention situations,'" and one "that requires consideration of all of the competing and relevant interests raised by an application for intervention." *United States v. Hooker Chemicals & Plastics Corp.*, 749 F. 2d 968 (2d Cir. 1984) (intervention denied in environmental action involving emergency abatement powers under statute, based on adequacy of government's representation) (citations omitted). Consequently, in the words of the court:

> The various components of the Rule are not bright lines, but ranges—not all "interests" are of equal rank, not all impairments are of the same degree, representation by existing parties may be more or less adequate, and there is no litmus paper test for timeliness. Application of the Rule requires that its

---

[6] This case involves intervention in an SEC enforcement action seeking, among other things, equitable relief under the federal securities laws. It therefore raises a threshold issue regarding the applicability of Section 21(g) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u(g), which prohibits consolidation or coordination of certain SEC enforcement actions with other actions not brought by the Commission. Some courts have interpreted this provision as a bar to intervention in SEC enforcement actions, at least with respect to investors. *SEC v. Wozniak,* 1993 U.S. Dist. Lexis 1241, at *1 (N.D. Ill. Feb. 8, 1993) (memorandum opinion and order describing 21(g) as an impenetrable wall against intervention by injured investor). However, this Court has taken the contrary view, holding that based upon the plain language of Section 21(g) (which makes no reference to intervention), and its intended purpose (which is to exempt the Commission from compulsory consolidation in multidistrict litigation), Section 21(g) is not an absolute bar to intervention in SEC enforcement actions. *SEC v. Credit Bancorp, Ltd.,* 194 F.R.D. 457, 465-66 (S.D.N.Y. 2000) (finding "no persuasive authority" that Section 21(g) bars intervention in all SEC enforcement actions). Therefore, in this Court at least, Section 21(g) is not an impediment to intervention by Better Markets in this case.

components be read not discretely, but together. A showing that a very strong interest exists may warrant intervention upon a lesser showing of impairment or inadequacy of representation. Similarly, where representation is clearly inadequate, a lesser interest may suffice as a basis for granting intervention.

*Id.*

Applied in accordance with these principles, Rule 24(a)(2) entitles Better Markets to intervene in this case.

### 1. **The Motion is timely.**

Given that this case was just filed on October 19, 2011, the Motion to Intervene is unquestionably timely. When assessing timeliness under Rule 24, courts look to a variety of factors, including "(1) how long the applicant had notice of the interest before it made the motion to intervene; (2) prejudice to existing parties resulting from any delay; (3) prejudice to the applicant if the motion is denied; and (4) any unusual circumstances militating for or against a finding of timeliness." *United States v. Pitney Bowes, Inc.,* 25 F. 3d at 70.

The Motion to Intervene satisfies each of these criteria. It is being **filed and served only 15 days** after the SEC initiated its enforcement action and publicly announced the simultaneous settlement with Citigroup. *See* SEC Litigation Release 2011-214 (Oct. 19, 2011).[7] Better Markets did not know, or have any reason to know, of the SEC's action or the terms of the Proposed Settlement prior to that date. Once the case was publicly announced, Better Markets acted diligently to review and analyze the case and prepare and file its Motion and supporting papers. The passage of time in this case falls well short of the time periods ranging from eight months to three years that courts have found to be excessive under Rule 24. *SEC v. Euro Security Fund,* 2006 U.S. Dist. LEXIS 34133, at *7-8 (S.D.N.Y. May 30, 2006), and cases cited therein.

---

[7] *Available at http://sec.gov/news/press/2011/2011-214.htm.*

Furthermore, because the process for evaluating the adequacy of the Proposed Settlement by the Court has only just begun, there can be no prejudice to the SEC or Citigroup arising from the timing of the Motion to Intervene.  Conversely, denial of the Motion on timeliness grounds would be extremely prejudicial to Better Markets, depriving it of the irreplaceable opportunity to challenge the Proposed Settlement and to protect its interest in promoting transparency, accountability, and oversight in the securities markets.  For all of these reasons, and because there are no other unusual circumstances present in this case that bear on this issue, the Motion to Intervene should be deemed timely.

## 2. <u>Better Markets has a direct, substantial, and legally protectable interest in this case.</u>

Better Markets has the requisite interest in this case to justify intervention as of right. The language of Rule 24 frames the interest requirement in broad terms, requiring simply that the intervenor "claim **an interest relating to the property or transaction** that is the subject of the action." Fed. R. Civ. P. 24(a)(2) (emphasis added).[8]  Better Markets certainly meets the literal terms of this formulation, and it also satisfies the interest test as it has been developed and applied by the courts in cases involving public interest organizations.

The U.S. Supreme Court made clear decades ago that the interest requirement for purposes of intervention under Rule 24 is to be liberally construed, and not narrowly tied to specific property or pecuniary interests.  In *Cascade Natural Gas Corp. v. El Paso Natural Gas Co.,* 386 U.S. 129 (1967), the Court held that the State of California had the right to intervene in

---

[8] This version of Rule 24, adopted in 1966, replaced a more narrow standard that required the intervenor to claim an interest in the distribution or disposition of **specific property** involved in an action.  As observed in the Advisory Committee notes to Rule 24, courts often ignored the literal terms of this language, since they were "unduly" restrictive.  The textual changes in Rule 24 thus reflect an evolution toward a more liberal, pragmatic, and flexible approach to intervention.

an antitrust action brought by the United States, so that the state could be heard on the merits of a divestiture order that had been negotiated between the Government and the defendant natural gas company. The merger that was challenged in the action threatened to have a significant impact on the natural gas market in California.

The Court held that California's interest in fostering a "competitive system" for the distribution of natural gas in the state was plainly sufficient to warrant its intervention in the Government's enforcement action. Undoubtedly influencing the Court's decision to allow intervention was its conviction that the existing parties to the negotiated order—i.e. the United States and the defendant gas company—had "fallen short," *id.* at 136, and that the divestiture order was the result of a process in which "the United States knuckled under" to the defendant in the settlement negotiations over the terms of the order, *id.* at 141. The Court granted intervention, vacated the order of divestiture, and required de novo hearings on the type of divestiture that would be consistent with the Court's prior mandate in the case. *Id.* at 136.

In *Cascade*, the Supreme Court thus established the broad principle that intervention is appropriate, even in a government enforcement action, where a party seeks to advance not its own pecuniary gain, but the general public interest with which the intervenor is singularly concerned.[9]

Since *Cascade* was decided, the federal courts have filled in the contours of the "interest" standard to some degree. In the Second Circuit as well as other circuits, an intervenor's interest must be "direct, substantial, and legally protectable." *New York News, Inc. v. Kheel,* 972 F. 2d 482, 486 (2d Cir. 1992). Courts have applied this principle to allow intervention based on a

---

[9]   The decision in *Cascade* reflects a particularly strong resolve to interpret the Rule 24 interest standard broadly. The Court adopted a liberal interpretation of the standard even though it was applying the more restrictive version of Rule 24, which was in effect at the time the events in the case transpired.

variety of environmental and aesthetic interests. In *New York v. Gutierrez*, the U.S. District Court for the Eastern District of New York held that a non-profit organization comprised of recreational fishermen had the requisite direct, substantial, and legally protectable interest to intervene in an action by the State of New York challenging the management of east coast flounder fisheries by the Department of Commerce and other federal agencies. 2008 U.S. Dist. LEXIS 94779, at *16-17 (E.D.N.Y. 2008), *rev'd on other grounds, New York v. Atlantic States Marine Fisheries Comm'n,* 609 F.3d 524 (2d Cir. 2010).[10] In *Great Atlantic & Pacific Tea Co., Inc. v. Town of East Hampton,* the court held that an environmental organization had a sufficient legal interest to warrant intervention in a case involving threatened land development where the organization had supported the zoning legislation at issue and where the personal interests of its members in environmental quality were threatened. 178 F.R.D. 39, 42 (E.D.N.Y. 1998) (intervention denied based on adequate representation by town).

In *Coalition of Arizona/New Mexico Counties for Stable Economic Growth v. Dep't of the Interior,* 100 F. 3d 837 (10th Cir. 1996) (intervention granted), the Tenth Circuit held that an avid naturalist satisfied the interest standard for purposes of intervening in a case challenging designation of the Mexican Spotted Owl as an endangered species. The court found that the movant's interest in the Owl as a wildlife photographer, coupled with his "persistent record of advocacy for its protection," established the direct and substantial interest required for

---

[10] In *Gutierrez*, the district court also held that the intervenor's interest was not adequately represented because the existing plaintiff had committed "nonfeasance" in the case by failing to name a party whose participation was necessary to afford complete relief. *Gutierrez* at *39. The Second Circuit reversed the district court's determination that the intervenor could assert a claim against that party under the Administrative Procedure Act, and it therefore invalidated the basis for the district court's holding that representation was inadequate based on "nonfeasance." *New York v. Atlantic States Marine Fisheries Commission,* 609 F.3d 524, 52931 (2d Cir. 2010). The Second Circuit did not, however, disturb the lower court's ruling that the non-profit association of recreational fishermen had a cognizable interest in the flounder population that warranted intervention under Rule 24(a)(2).

intervention. *Id.* at 841. The court emphatically rejected the notion that an economic interest must underlie intervention as of right:

> [E]conomic interest is not the sine qua non of the interest analysis for intervention as of right. To limit intervention to situations where the applicant can show an economic interest would impermissibly narrow the broad right of intervention enacted by Congress and recognized by the courts.

*Id.*

Just as the intervenor in *Cascade* had a cognizable interest in the economic environment, and just as the intervenor in *Coalition* had a cognizable interest in the natural environment, Better Markets has a cognizable interest in the condition of our financial markets that also satisfies the requirements of Rule 24.

As explained above in Section II, the primary goal of Better Markets is to promote transparency, accountability, and oversight in the financial markets, and it has a "persistent record of advocacy" demonstrating its commitment to the attainment of those objectives. The outcome of this enforcement action will have a direct and substantial impact on all three of those goals. The SEC's enforcement action is an attempt to remedy what is in effect a toxic spill in financial terms. Whether and how the Proposed Settlement actually remediates the harms caused by Citigroup will profoundly affect our financial market in precisely the ways that are of greatest interest to Better Markets.

The Complaint and the Memorandum filed by the SEC in support of the Proposed Settlement undermine transparency by providing only the most skeletal information about the fraud, the persons responsible, and the rationale for the sanctions imposed. In fact, the Proposed Settlement raises a host of questions that must be answered before the agreement can be fully evaluated. This Court's order of October 27 reflects this fact, and it appropriately requires the SEC to provide much more information to justify its Proposed Settlement.

The Proposed Settlement undermines transparency in another way by allowing the defendant to neither admit nor deny the allegations in the Complaint. This common practice in SEC enforcement actions is a matter of special concern, since it leaves investors and the public at large in a state of perpetual limbo regarding the true legal and moral culpability of the defendant. *See SEC v. Vitesse Semiconductor Corp.*, 771 F. Supp. 2d 304, 309 (S.D.N.Y. 2011); Order of Oct. 27, 2011 (asking the SEC to address the absence of admissions in this case). And, of course, it prevents investors from using collateral estoppel against Citigroup if they seek damages for the fraud.

The Proposed Settlement will reduce accountability by failing to impose any sanctions against the individual employees who planned and carried out Citigroup's fraudulent scheme, and by agreeing to accept extraordinarily weak sanctions against the corporate entity itself. This outcome not only fails to achieve accountability in this case, it also undermines accountability more generally by establishing a precedent that, far from deterring misconduct on Wall Street, will actually incentivize it.

Finally, the Proposed Settlement undermines oversight by damaging the SEC's credibility and effectiveness as an enforcement authority. The message to Wall Street will simply be that the consequences of being caught in a fraudulent scheme are well worth the gains. The deterrent value of the case will be lost, and as a result, an untold number of investors will suffer harm from future misconduct by emboldened Wall Street firms.

### 3. **Better Markets is so situated that disposing of the action may as a practical matter impair or impede its ability to protect its interest.**

The disposition of this action without the participation of Better Markets will undoubtedly impair or impede the ability of Better Markets to protect its interest. Courts applying this test typically examine the alternative remedies that those seeking intervention have

at their disposal for protecting their interests, which are usually financial in nature.  For example,

courts often hold that investors seeking intervention in SEC enforcement actions fail the

impairment test under Rule 24(a)(2) because they have alternative means of seeking recovery of

their lost funds.  Their options include separate damage actions, *see, e.g., SEC v. Canadian

Javelin Limited,* 64 F.R.D. 648, 650 (S.D.N.Y. 1974), or participation in summary proceedings

to assert claims against assets held in receivership, *see SEC v. Credit Bancorp, Ltd,* 194 F.R.D. at

467, and cases cited therein.

      In this case, by contrast, Better Markets has no equivalent alternative forum in which to

protect its interest in the Proposed Settlement.  Once the matter is concluded, the Proposed

Settlement will take effect; the damage to transparency, accountability, and oversight will be

done; and there will be nothing left to pursue.  The interests of Better Markets will certainly be

be impaired if it is deprived of the unique opportunity to participate in this case.  The only

sufficient remedy for Better Markets is intervention.

## 4. **The existing parties to this case do not adequately represent the interests of Better Markets.**

      The fourth and final element for intervention as of right under Rule 24 requires the

person seeking intervention to show that their interests are not adequately represented by the

existing parties to the case.  Although this requirement generally places only a "minimal" burden

on the would-be intervenor, where the state is already a party acting as *parens patriae*, a

presumption of adequate representation arises.  *United States v. Hooker,* 749 F. 2d at 984-85.

The court in *Hooker* noted that while establishing collusion is not necessary, there must be a

"strong affirmative showing that the sovereign is not fairly representing the interests of the

applicant." *Id.* 986.  *See also Butler, Fitzgerald & Potter v. Sequa Corp.,* 250 F. 3d 171, 180 (2d

Cir. 2001) (if the putative intervenor and a named party can be said to share the same ultimate

objective, then the presumption of adequate representation must be overcome through "evidence of collusion, adversity of interest, nonfeasance, or incompetence").

In this case, the presumption is overcome because Better Markets can make a "strong showing" that SEC has not represented the public interest adequately in this case. The most compelling evidence is the Proposed Settlement itself: its lack of transparency, its weak sanctions, and its failure to hold the responsible parties accountable.

This Court's Order of October 27, 2011 provides strong support for the conclusion that the Proposed Settlement lacks the requisite degree of transparency. The Order specifies the information that the SEC must provide to the Court as it determines "whether the proposed judgment is fair, reasonable, adequate, and in the public interest." Order at 1. The nine questions set forth in the Order address critical infirmities appearing on the face of the Proposed Settlement, including the absence of admissions, the understated measure of investor losses, the questionable deterrent value of the fine, the lack of accountability for individual offenders, and, perhaps most important, the incredible premise that a fraud of "this nature and magnitude" could result from mere negligence. Order at 1-3. The fact that the SEC failed to address these fundamentally important questions in its Memorandum, and the fact that the Court was therefore compelled to request the information *sua sponte*, is powerful evidence that the SEC is inadequately representing the interests promoted by Better Markets.

The lack of adequate representation also follows from the narrow and weak sanctions imposed under the Proposed Settlement. For example, the Proposed Settlement fails to encompass any of the employees at Citigroup who were responsible for the fraud, nor does it explain why those individuals were not held accountable. This factor weighs heavily against the fairness of a settlement, particularly where, as here, the monetary sanctions imposed on the

corporate defendant must ultimately be borne by its innocent shareholders. *See SEC v. Bank of America Corp.,* 653 F. Supp. 2d 507, 509 (S.D.N.Y. 2009) (rejecting proposed consent judgment). These omissions also substantially undermine the public interest, since the imposition of sanctions against responsible corporate executives, not just the corporate entity, is an essential element in deterring misconduct.

The Proposed Settlement also allows the defendant to engage in the fundamentally exculpatory ritual of not admitting or denying the allegations. This undermines transparency, as "the public will never know if the SEC's charges are true." *SEC v. Vitesse,* 771 F. Supp. 2d at 309. It also undermines the interests of Citigroup's victims, who lose the benefit of collateral estoppel in parallel private civil actions. *Id.* at 308.

Finally, the Proposed Settlement imposes monetary sanctions that can only be regarded as "trivial" in relation to the misconduct alleged. *See SEC v. Bank of America,* 653 F. Supp. 2d at 512 ($33 million penalty deemed trivial for a false statement that infected a multi-billion dollar merger). As demonstrated in the accompanying Opposition to the Proposed Settlement, the disgorgement and the fine imposed are not commensurate with the gravity of the violations at issue, nor will they deter Citigroup from future misconduct given its massive financial resources.

In addition to the flaws in the Proposed Settlement and its lack of transparency, there is more evidence of the SEC's underlying failure to safeguard the public interest in this case. The SEC has clearly been influenced by a host of considerations in its settlement practices, and not all of them serve the public interest. For example, the SEC has sought to conserve its resources and avoid the litigation risk of a defeat at trial. *See* Danne L. Johnson, *SEC Settlement: Agency Self-Interest or Public Interest,* 12 Fordham J. Corp. & Fin. L. 627, 632 (2007) (the SEC sacrifices the public interest in transparency and accountability in its desire to conserve resources

and avoid litigation risk).  At the same time, the SEC has clearly sought to foster an image as effective enforcer of the law.

As stated by the Court in *SEC v. Bank of America Corp.,* 653 F. Supp. 2d at 510:

> Overall, indeed, the parties' submissions, when carefully read, leaved the distinct impression that the proposed Consent Judgment was a contrivance designed to provide the SEC with the façade of enforcement and the management of the Bank with a quick resolution of an embarrassing inquiry – all at the expense of the sole alleged victims, the shareholders.  Even under the most deferential view, this proposed Consent Judgment cannot remotely be called fair.

The same observation applies here.  A quick review of the SEC's press release posted on its website confirms the point: the SEC devoted nearly as much print to the press release as it did to the Memorandum in support of the Proposed Settlement.  Moreover, the release is accompanied by a chart graphically depicting, among other things, the companies and officers charged by the "SEC Charges Stemming From the Financial Crisis."  *See* Chart on SEC Website.[11]

As the case has progressed, the SEC's conflict with the public interest has only intensified.  As planned, the SEC's announcement of the Proposed Settlement drew heavy press coverage.  Under this scrutiny—not to mention the need to avoid further criticism from Congress about the way the agency discharges its responsibilities—the SEC must tenaciously defend the Proposed Settlement regardless of its merits, since a rejection by the Court would be a significant and embarrassing setback.

In contrast with the SEC, Better Markets has no conflict whatsoever with the public interest.  It is solely focused on promoting transparency, accountability, and oversight in the financial markets, for the ultimate benefit of the public, and without regard to anyone's financial

---

[11] *Available at* http://sec.gov/news/press/2011/2011-214-chart-stats.pdf.

interests or its image before the public or Congress.  This perspective represents a unique and valuable commitment to the public interest that is distinguishable from that of the SEC for purposes of assessing adequate representation under Rule 24.

Taken together, all of these deficiencies in the Proposed Settlement constitute the "strong affirmative showing" necessary to overcome the presumption that the SEC is adequately representing the interests that Better Markets seeks to protect—transparency, accountability, and oversight of the securities market.[12]

The Supreme Court's decision in *Cascade* implicitly supports this analysis.  The opinion clearly suggests that a settlement in a government enforcement action can be so deficient, under all the facts and circumstances, as to justify intervention by outside parties whose interests have been neglected in the settlement process.  In *Cascade*, the Court was profoundly dissatisfied with the government's handling of the settlement, finding that nearly three years after the Court's initial mandate, "no divestiture in any meaningful sense has been directed." 386 U.S. at 131.  In unusually harsh language, the Court criticized the terms of the settlement as "permeated" with "evil."  *Id.* at 142.  Characterizing the essential failure by the government in the negotiation process, the Court stated that—

---

[12] The decision in *Hooker* indicates that an applicant's insistence on "more drastic relief" in a settlement will not suffice to establish inadequate representation.  *Hooker,* 749 F. 2d at 985.  This does not undercut Better Markets's position in this case for two reasons.  First, the court in *Hooker* tied that principle to cases where "the sovereign's interest is in securing **preventive** relief of the same general sort as the applicant." *Id.* (emphasis added).  In *Hooker,* the government was invoking its statutory emergency powers to halt imminent environmental harm. *Id.* at 970.  At stake in this case, by contrast, is not only injunctive relief against future violations, but a more expansive array of sanctions that must adequately serve the public's broader interest in transparency, punishment, and deterrence.  Second, whether the failure to obtain "more drastic relief" evidences a lack of adequate representation must be viewed as a matter of degree.  As argued in text above, and in accordance with the Supreme Court's decision in *Cascade,* at some point the terms of a government settlement can become so ineffective that they must be deemed to constitute inadequate representation of the applicant's interest within the meaning of Rule 24.

"El Paso [the entity that unlawfully acquired a competitor] carried the day, obtained a consent decree that promises to perpetuate rather than terminate this unlawful merger, and that threatens to turn loose on the public a New Company unable to maintain the competitive role that Pacific Northwest filled before this illegal transaction took place."

*Id.* at 141-42.

The Court went so far as to set forth in the opinion a detailed prescription of the terms that, at a minimum, the divestiture order had to include. And the Court was unmoved by the dissent's strenuous argument that "the determination of what the public interest requires is the statutory duty and responsibility of the Government," not that of any "volunteer" claiming "the Government might have used bad judgment in conducting or settling a lawsuit." *Id.* at 149, 158.

In light of these considerations, the Court permitted intervention by the State of California, along with a natural gas distributor and a natural gas consumer in the region, to help ensure that the defects in the divestiture order would be cured and that the order would adequately address the anti-competitive violations of the defendant.

As in *Cascade*, the record before this Court indicates that the Proposed Settlement is so deficient and so incongruous with the nature and scope of the violations alleged as to overcome the normal presumption that the SEC is adequately representing the public interest or the specific goals of transparency, accountability, and oversight that Better Markets seeks to protect and advance.

Because Better Markets satisfies all of the elements required for intervention as of right under Rule 24(a)(2), it should be granted leave to intervene for the limited purposed of challenging the Proposed Settlement.

## B. BETTER MARKETS ALSO SATISFIES THE CONDITIONS FOR PERMISSIVE INTERVENTION.

If the Court denies Better Markets' Motion to Intervene as of right under Rule 24(a)(2), it should nevertheless grant the Motion to Intervene as a matter of permissive intervention under Rule 24(b).

Rule 24(b) imposes three conditions on permissive intervention: (1) the motion must be timely; (2) the movant must have a claim or defense that shares with the main action a common question of law or fact; and (3) in exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights. Fed. R. Civ. P. 24(b)(1), (3).

As several courts have observed, requests for permissive intervention are subject to such broad judicial discretion that they are virtually never reversed. *See United States v. Pitney Bowes*, 25 F. 3d at 73; *H.L. Hayden Co. v. Siemens Medical Systems, Inc.,* 797 F. 2d 85, 89 (2d Cir. 1986) (denying intervention to state that sought to lift a protective order covering evidence of antitrust violations in a private action). Furthermore, courts may consider a variety of additional factors when ruling on a motion for permissive intervention, some of which overlap with the factors governing intervention as of right. They include the nature and extent of the intervenor's interest, the degree to which those interests are adequately represented by other parties, and whether parties seeking intervention will significantly contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal question presented. *Hayden,* 797 F. 2d at 89.

In this case, all of the necessary conditions for permissive intervention are present, and the Court should exercise its broad discretion in favor of allowing Better Markets to intervene.

1. **The Motion to Intervene is timely and the claim of Better Markets shares common questions of law or fact with the main action.**

The first two prerequisites under Rule 24(b) are easily met. The Motion to Intervene is timely for the same reasons set forth in Section III.A.1. above. Moreover, the claim that Better Markets seeks to advance indisputably shares common questions of law and fact with the main action. The issue now pending before the Court is whether the Proposed Settlement is fair, reasonable, adequate, and in furtherance of the public interest. That is precisely the issue that Better Markets seeks to address by intervening.

Additional facts are certainly necessary to evaluate the adequacy of the Proposed Settlement. The Court has already identified much of the core information necessary to fill those gaps by issuing its October 27 Order. Better Markets will offer yet additional facts in support of its argument that the Proposed Settlement fails to meet the applicable standard. However, that does not alter the fundamental commonality in fact and law existing between the Better Markets claim and the claim pending in the underlying action.

2. **Intervention by Better Markets will not unduly delay or prejudice the adjudication of the original parties' rights.**

The "principal guide" in deciding a motion for permissive intervention is the degree to which the intervention will "unduly delay or prejudice the adjudication of the original parties' rights." *United States v. Pitney Bowes, Inc.*, 25 F. 3d at 73. Intervention by Better Markets does not pose this threat, and on the basis of this determinative factor, permissive intervention should be granted.

Courts in this Circuit and elsewhere are sensitive to the disruptive effects that intervention can sometimes have in cases where agencies such as the SEC have brought enforcement actions. However, those cases almost invariably involve intervention by investors.

For example, in *SEC v. Everest Management Corp.,* 475 F. 2d at 1240, the Second Circuit declined to allow private plaintiffs seeking damages to intervene in an SEC enforcement action, explaining that "the complicating effect of the additional issues and the additional parties outweighs any advantage of a single disposition of the common issues." *See also SEC v. Bear Stearns & Co.,* 2003 U.S. Dist. LEXIS 14611, at *8-12 (S.D.N.Y. 2003) (reviewing the case law and holding that granting intervention to investors "would open the floodgates to a multitude of potential intervenors"). [13]

Intervention by Better Markets in this case simply does not raise the concerns articulated in these decisions. Better Markets is not a defrauded investor seeking to prove a cause of action for damages against Citigroup. It is instead a single public interest organization with a unique and demonstrable interest in the core issues that are already squarely before the Court. The limited involvement of Better Markets would not upset the limitations that courts have established on intervention by investors.

Moreover, Better Markets seeks intervention for the limited purpose of objecting to the Proposed Settlement (or any revised settlements that the parties may seek to enter in connection with the disposition of this case). It does not wish to be involved in any negotiations, discovery procedures, or other litigation activities that may arise from the Court's ruling on the Proposed Settlement. Therefore, its involvement will not unduly delay or prejudice the adjudication of the original parties' rights.

---

[13]   Some courts have actually recognized the value of investor participation in SEC enforcement actions. In *SEC v. Everest Management Corp.,* 475 F. 2d at 1239, the Second Circuit observed that allowing investors to join with the SEC in its enforcement cases would actually promote "vigorous enforcement of the securities laws through private actions," a goal that federal courts consistently favor. The court nevertheless adhered to the commonly held view that allowing intervention by investors in SEC enforcement actions is unwise.

Another recurrent theme in cases involving intervention by investors is that their involvement can interfere with a regulator's attempt to obtain a settlement or consent decree from the wrongdoer. *SEC v. Everest Management Corp.,* 475 F. 2d at 1240; *SEC v. Bear Stearns & Co.,* 2003 U.S. Dist. LEXIS at 9-10. This argument has no place in this case, since it begs the question. Denying intervention because it might obstruct progress toward a settlement can only be justified **if** one assumes that the settlement is beneficial and serves the public interest. But that is the core question facing the Court and the one that Better Markets seeks to address. Accordingly, permissive intervention by Better Markets cannot legitimately be opposed based on the circular **assumption** that settlement is *per se* a desirable goal.

3.  **Other factors weigh in favor of permissive intervention by Better Markets.**

The other factors that courts consider when deciding a motion for permissive intervention all militate in favor of granting intervention to Better Markets in this case. Two of those factors—the nature of the intervenor's interest and the degree of adequate representation by existing parties—have been discussed above and they each support the intervention of Better Markets.

The third consideration is whether parties seeking intervention will significantly contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal question presented. *H.L. Hayden Co. v. Siemens Medical Systems, Inc.,* 797 F. 2d at 89. This is precisely the role that Better Markets can and will play in this case if it is permitted to intervene.

There is a compelling need in this case for a clearer and more comprehensive disclosure of the underlying facts, and Better Markets can assist with that effort. One of the most troubling aspects of the Proposed Settlement is the paucity of clear and compelling detail in the Complaint

and the supporting Memorandum filed by the SEC. Those documents contain only a generalized description of the violations by Citigroup, and they actually mask the outrageous nature of Citigroup's conduct. This understated portrayal of the case makes it impossible for the Court or the public to accurately assess whether the Proposed Settlement is truly fair, reasonable, adequate, and in the public interest.

As argued in the Opposition, this state of affairs could be remedied by requiring all of the underlying evidence gathered by the SEC to be made public. But short of that, Better Markets can still assist the Court by assembling additional key facts from the limited record now available and by clearly and succinctly explaining their significance. In addition, in light of those facts, Better Markets can help evaluate the appropriateness of the Proposed Settlement under the applicable legal standard so that the outcome of this case better serves the interests of the public and of Better Markets. Accordingly, the Court should exercise its wide discretion and grant Better Markets leave to intervene.

## CONCLUSION

For the reasons set forth above, this Court should grant the Motion and issue an order allowing Better Markets to intervene in this case under Rule 24 of the Federal Rules of Civil Procedure.

Dated:  Washington, DC
       November 3, 2011

Respectfully submitted,

Dennis M. Kelleher
dkelleher@bettermarkets.com
Stephen W. Hall
shall@bettermarkets.com
Counsel for Better Markets, Inc.
1825 K Street, NW, Suite 1080
Washington, DC
Tel: 202-618-6464/Fax: 202-618-6465

## CERTIFICATE OF SERVICE

I hereby certify that I caused a copy of the foregoing Memorandum of Law in Support of

Motion to Intervene to be served upon the following counsel for the parties to this action, at the

following addresses, on November 3, 2011, by hand delivery:

Counsel for Plaintiff Securities and Exchange Commission

Jeffrey Thomas Infelise
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-4010
Tel: 202-551-4904
Fax: 202-722-9362
Email: infelisej@sec.gov

Counsel for Defendant Citigroup Global Markets Inc.

Brad Scott Karp
Paul, Weiss, Rifkind, Wharton & Garrison LLP (NY)
1285 Avenue of the Americas
New York, NY 10019
Tel: 212-373-2384
Fax: 212-373-2384
Email: bkarp@paulweiss.com


Dated:  Washington, DC
        November 3, 2011

Dennis M. Kelleher
Counsel for Better Markets, Inc.
1825 K Street, NW, Suite 1080
Washington, DC
Tel: 202-618-6464
Fax: 202-618-6465
dkelleher@bettermarkets.com

# EXHIBIT A

# TO MEMORANDUM OF LAW IN SUPPORT OF MOTION TO INTERVENE

# EXHIBIT A

# Bloomberg

# Citigroup Finds Obeying the Law Too Darn Hard: Jonathan Weil

By Jonathan Weil - Nov 2, 2011

Five times since 2003 the Securities and Exchange Commission has accused Citigroup Inc. (C)'s main broker-dealer subsidiary of securities fraud. On each occasion the company's SEC settlements have followed a familiar pattern.

Citigroup neither admitted nor denied the SEC's claims. And the company consented to the entry of either a court injunction or an SEC order barring it from committing the same types of violations again. Those "obey-the-law" directives haven't meant much. The SEC keeps accusing Citigroup of breaking the same laws over and over, without ever attempting to enforce the prior orders. The SEC's most recent complaint against Citigroup, filed last month, is no different.

Enough is enough. Hopefully Jed Rakoff will soon agree.

Rakoff, the U.S. district judge in New York who was assigned the newest Citigroup case, is saber-rattling again, threatening to derail the SEC's latest wrist-slap. The big question is whether he has the guts to go through with it. Twice since 2009, Rakoff has put the SEC through the wringer over cozy corporate settlements, only to give in to the agency later.

That the SEC went easy on Citigroup again is obvious. The commission last month accused Citigroup of marketing a $1 billion collateralized debt obligation to investors in 2007 without disclosing that its own traders picked many of the assets for the deal and bet against them. The SEC's complaint said Citigroup realized "at least $160 million" in profits on the CDO, which was linked to subprime mortgages. For this, Citigroup agreed to pay $285 million, including a $95 million fine -- a pittance compared with its $3.8 billion of earnings last quarter.

## Looking Deliberate

On top of that, the agency accused Citigroup of acting only negligently, though the facts in the SEC's complaint suggested deliberate misconduct. The SEC named just one individual as a defendant, a low-level banker who clearly didn't act alone. Plus, the SEC's case covered only one CDO, even though Citigroup sold many others like it.

Here's what makes the SEC's conduct doubly outrageous: The commission already had two cease-and-desist orders in place against the same Citigroup unit, barring future violations of the same section of the securities laws that the company now stands accused of breaking again. One of those orders came in a 2005 settlement, the other in a 2006 case. The SEC's complaint last month didn't mention either order, as if the entire agency suffered from amnesia.

The SEC's latest allegations also could have triggered a violation of a court injunction that Citigroup agreed to in 2003, as part of a $400 million settlement over allegedly fraudulent analyst-research reports. Injunctions are more serious than SEC orders, because violations can lead to contempt-of-court charges.

The SEC neatly avoided that outcome simply by accusing Citigroup of violating a different fraud statute. Not that the SEC ever took the prior injunction seriously. In December 2008, the SEC for the second time accused Citigroup of breaking the same section of the law covered by the 2003 injunction, over its sales of so-called auction-rate securities. Instead of trying to enforce the existing court order, the SEC got yet another one barring the same kinds of fraud violations in the future.

It gets worse: Each time the SEC settled those earlier fraud cases, Citigroup asked the agency for waivers that would let it go about its business as usual. (This is standard procedure for big securities firms.) The SEC granted those requests, saying it did so based on the assumption that Citigroup would comply with the law as ordered. Then, when the SEC kept accusing Citigroup of breaking the same laws again, the agency granted more waivers, never revoking any of the old ones.

## Legal Standard

Rakoff seems aware of the problem, judging by the questions he sent the SEC and Citigroup last week. Noting that the SEC is seeking a new injunction against future violations by Citigroup, he asked: "What does the SEC do to maintain compliance?" Additionally, he asked: "How many contempt proceedings against large financial entities has the SEC brought in the past decade as a result of violations of prior consent judgments?" We'll see if the SEC finds any. A hearing is set for Nov. 9.

The legal standard Rakoff must apply is whether the proposed judgment is "fair, reasonable, adequate and in the public interest." Among Rakoff's other questions: "Why should the court impose a judgment in a case in which the SEC alleges a serious securities fraud but the defendant neither admits nor denies wrongdoing?" And this: "How can a securities fraud of this nature and magnitude be the result simply of negligence?"

A Citigroup spokeswoman, Shannon Bell, said, "Citi has entered into various settlements with the SEC over the years, and there is no basis for any assertion that Citi has violated the terms of any of those settlements." I guess it depends on the meaning of the words "settlement" and "violated."

Rakoff gained fame in 2009 when he rejected an SEC proposal to fine Bank of America Corp. (BAC) $33 million for disclosure violations related to its $29.1 billion purchase of Merrill Lynch & Co. Rakoff said the settlement punished Bank of America shareholders for the actions of its executives, none of whom were named as defendants.

Months later, though, Rakoff approved a $150 million fine for the same infractions, on the condition that the money would be redistributed to Bank of America stockholders who supposedly were harmed. The stipulation was classic window dressing. Even so, Rakoff became something of a folk hero, simply for daring to question an SEC settlement. Most other judges are rubber stamps.

Rakoff would serve the public well by rejecting any deal that leaves the truth of the SEC's allegations undetermined or fails to treat Citigroup as a repeated offender. Grandstanding alone won't cut it anymore. Rakoff has come a long way already. Here's hoping this time he goes the distance.

(Jonathan Weil is a Bloomberg View columnist. The opinions expressed are his own.)

To contact the writer of this column: Jonathan Weil in New York at jweil6@bloomberg.net.

To contact the editor responsible for this column: James Greiff at jgreiff@bloomberg.net.

©2011 BLOOMBERG L.P. ALL RIGHTS RESERVED.

# EXHIBIT B

# TO MEMORANDUM OF LAW IN SUPPORT OF MOTION TO INTERVENE

# EXHIBIT B



**FINANCIALS**

Close

## SEC pushes Citi toward $200m settlement



By Kara Scannell in New York
Published: September 15 2011 06:11 | Last updated: September 15 2011 17:22

The US Securities and Exchange Commission is pressuring **Citigroup** to pay more than $200m to resolve an investigation into the sale of a mortgage-related security in 2007, according to a person familiar with the matter.

No agreement has been reached between the parties over the settlement size and negotiations are continuing, this person said. A final deal could be weeks away.

It is not clear if any individuals will be charged in the case.

The potential settlement comes as the SEC is gearing up to resolve half a dozen cases involving **Wall Street's** sale of CDOs, people familiar with the matter say. The SEC has previously reached settlements with **Goldman Sachs** and **JPMorgan Chase** over their securitisation and sale of CDOs to investors after alleging they did not tell buyers that hedge funds betting against the securities helped structure them.

**Goldman paid $550m to settle** while JPMorgan paid $153.6m; neither bank admitted or denied wrongdoing. Investigations against other major financial institutions, collateral managers and the credit rating agencies involved in structuring the deals are ongoing.

The Citi settlement discussions were first reported by The Wall Street Journal. Citigroup declined to comment. A SEC spokesman declined to comment.

The settlement will be the second for the bank stemming from the credit crisis. Last year Citigroup paid **$75m to settle a SEC lawsuit** alleging the bank failed to disclose nearly $40bn in subprime assets on its books. As part of that settlement, the bank's former chief financial officer agreed to pay $100,000 and the bank's one-time head of investor relations paid $80,000. Neither the company nor those individuals admitted or denied wrongdoing.

As part of the pact, Credit Suisse is expected to pay less than $5m to settle with the SEC over its role as a collateral manager on the Citigroup CDO, a different person familiar with the matter said. This person said the SEC is expected to allege that Credit Suisse failed to ensure that Citigroup's role in selecting the portfolio was disclosed to investors. The SEC has notified the bank that it does not plan to recommend any actions against the bank related to any other CDOs the bank structured or worked at collateral managers, this person said. The bank declined to comment.



The SEC is focusing on the role of collateral managers, which have a fiduciary duty to act in the best interest of investors in the debt. The SEC is also investigating Merrill Lynch's sale of a $1.5bn CDO structured for Magnetar, the Illinois based hedge fund, and the role of the collateral manager, NIR Capital Management. No charges have been filed. In that case the SEC is looking into whether NIR fulfilled its role as collateral manager and whether Merrill Lynch told buyers that Magnetar helped select the portfolio and also bet against it.

Copyright The Financial Times Limited 2011. Print a single copy of this article for personal use. Contact us if you wish to print more to distribute to others.

"FT" and "Financial Times" are trademarks of the Financial Times. Privacy policy | Terms
© Copyright The Financial Times Ltd 2011.

# EXHIBIT C

# TO MEMORANDUM OF LAW IN SUPPORT OF MOTION TO INTERVENE

# EXHIBIT C

Case 1:11-cv-07387-JGK   Document 15   Filed 11/05/11   Page 38 of 42



<u>The Wall Street Money Machine</u>

# Did Citi Get a Sweet Deal? Bank Claims SEC Settlement on One CDO Clears It on All Others



*(Flickr: digiart2001)*

*by Jesse Eisinger and Jake Bernstein*
*ProPublica, Oct. 20, 2011, 3:21 p.m.*

**261**

9

289

Like

**21**

Share

In the run-up to the global financial collapse, Citigroup's bankers worked feverishly to create complex securities. In just one year, 2007, Citi marketed more than $20 billion worth of deals backed by home mortgages to investors around the world, most of which failed spectacularly. Subsequent lawsuits and investigations turned up evidence that the bank knew that some of the products were low quality and, in some instances, had even bet they would fail.

The bank says it has settled all of its potential liability to a key regulator – the Securities and Exchange Commission -- with a $285 million payment that covers a single transaction, Class V Funding III. ProPublica first raised questions about the deal [1] in August 2010.  In announcing a case, the SEC said it had identified one low-level employee, Brian Stoker, as responsible for the bank's misconduct.

Related Articles
The 'Subsidy': How a Handful of Merrill Lynch Bankers Helped Blow Up Their Own Firm

by Jake Bernstein and Jesse Eisinger, ProPublica, Dec. 22

Banks' Self-Dealing Super-Charged Financial Crisis

by Jake Bernstein and Jesse Eisinger, ProPublica, Aug. 26

The Magnetar Trade: How One Hedge Fund Helped Keep the Bubble Going

by Jesse Eisinger and Jake Bernstein, ProPublica, April 9

It made no mention of the dozens of similar collateralized debt obligations, or CDOs, Citi sold to investors before the crash.

A bank spokesman said the SEC would not be examining any of those deals. "This means that the SEC has completed its CDO investigation(s) of Citi," the spokesman asserted in an e mail.

"The $285 million settlement resolves only the Class V Funding III CDO, and we will not hesitate to bring further charges where we determine that there has been unlawful conduct," an SEC spokesman said.

Did Citi get a sweet deal? Some observers think so.

"Citibank arranged countless CDOs that were built to fail, but the SEC apparently limited its case to a single CDO where they had particularly vivid and powerful proof," says Stephen Ascher, a securities litigator at Jenner & Block, which has sued Citibank on various structured finance transactions.

"This represents extreme caution, at best -- and a failure to grapple with the magnitude and harmfulness of the misconduct, at worst."

ProPublica has been investigating the practices of the investment banks in the lead-up to the financial crisis for three years. Our research found a number of Citi CDOs similar to the deal featured in the SEC's Class V complaint, and more information on Citi's CDO business has emerged in lawsuits and subsequent investigations. Responsibility for these practices did not begin or end with Mr. Stoker. Among the questions still unanswered: How much did Stoker's immediate bosses know? What did the heads of Citigroup's CDO business, fixed income business and trading businesses know about Citi's CDO dealings?

In the settlement announced this week, the SEC charged Citigroup with misleading its clients in the $1 billion Class V Funding III. The regulator said that the bank failed to disclose that it, rather than a supposedly independent collateral manager, had played a key role in choosing the assets in the deal when the bank marketed it to clients. Citigroup also failed to tell its clients that it retained a short position, or bet against, the CDO it created and sold. In addition to the $285 million fine, the SEC also charged Credit Suisse Alternative Capital, which was supposed to choose the assets that went into the CDO, and a low-level executive at that firm, with securities law violations.

Stoker becomes only the second investment banker after Goldman Sachs' Fabrice "Fabulous Fab" Tourre to be charged by the SEC in conjunction with the business of creating CDOs, which were at the heart of the financial collapse in the fall of 2008. According to the SEC, Stoker played a leading role in structuring Class V Funding III. Stoker declined to comment. His lawyer has said he is fighting the charges.

The SEC complaint shows that Stoker was regularly communicating with other Citi executives about his actions. One top Citi executive coaches employees in an email that Credit Suisse should tell potential buyers of Class V about how it decided to purchase the assets, even though Citi, not Credit Suisse, was making the calls.

In October 2006, people from Citi's trading desk approached Stoker about shorting deals that Citi arranged. Later, in Nov 3, 2006, Stoker's immediate boss inquired about Class V Funding III. Stoker told his boss that he hoped the deal would go through. He wrote that the Citi trading group had taken a position in the deal. Citi's trading desk was shorting Class V Funding III, betting that its value would fall. Stoker noted that Citi shouldn't tell Credit Suisse officials what was going on, and that Credit Suisse had agreed to be the manager of the CDO "even though they don't get to pick the assets." Less than two weeks later, this executive pressed Stoker to make sure that their group at Citi got "credit" for the profits on the short.

This Citi official, unnamed in the complaint, was not charged by the SEC.

If Class V Funding III was some outlier, the SEC's action might make more sense. But it wasn't. Citigroup's CDO operation churned out at least 18 CDOs around the same period. Often they were large CDOs, created with credit default swaps, effectively a bet that a given bond will rise or fall. Most of the CDOs included recycled Citi assets that the bank couldn't sell. By purchasing pieces of its older deals, Citigroup could complete deals and keep the prices for CDO assets higher than they otherwise would be. Some investors helped picked the assets and then bet against them, facts that Citi didn't clearly disclose to other investors in the deals.

Closing the book on Citi's CDO business means the public may never know the true story of Citigroup's, and Wall Street's, actions during the financial crisis. One of the largest victims of the CDOs was the bond insurer Ambac. The now-bankrupt firm settled with Citi in 2010, long before it got to the root of the problems with securities Citi convinced it to insure. A shareholder class action lawsuit that is wending its way through the courts has the potential to reveal some details, but often such cases are settled with evidence then sealed from public view.

Among the unresolved questions: What was Citigroup's role in a series of deals involving Magnetar, an Illinois-based hedge fund that invested in small portions of CDOs and then made big bets against them? Our investigation showed that Citi put together at least 5 Magnetar CDOs worth $6.5 billion [2]. Did Citi mislead the investors who lost big on these deals?

Here are some other questions about Citi CDOs created around the time of Class V Funding III:

888 Tactical Fund. A February 2007, $1 billion deal, it had a significant portion of other Citi deals in it. Did the bank have influence over the selection of the assets, as it did in Class V Funding III?

Adams Square Funding II. A $1 billion March 2007 deal. The pitch-book to clients for Class V Funding III was adapted almost wholesale from this deal, according to the SEC complaint. Was Citigroup shorting this deal, or adding assets that were selected by others to short the deal? And was that adequately disclosed to clients?

Ridgeway Court Funding II. Completed in June 2007, this $3 billion deal contained a mysterious $750 million position in a CDO index. Experts believe that such positions were included for the purposes of shorting the market. Did Citi disclose why it included these assets to the investors in this CDO? As much as 30 percent of the assets in the deal were from unsold Citi CDOs. Was this a dumping ground for decaying assets the bank could not unload, as a lawsuit by Ambac, which was settled, charged?

Armitage. This $3 billion March 2007 CDO looked a lot like Ridgeway II. It had a large portion of other CDOs, much of which came from other Citi deals, including $260 million from Adams Square Funding II. Did Citi adequately disclose to investors what they were buying?

Class V Funding IV. A $2 billion June 2007 deal, Citi appears to have done this directly with Ambac. The SEC complaint about Class V Funding III makes it clear that Ambac was unaware of Citi's position in that deal. Did the bank disclose more to Ambac in this deal?

Octonion. This $1 billion March 2007 CDO bought some of Adams Square Funding II. Adams Square II bought a piece of Octonion. A third CDO, Class V Funding III, also bought some of Octonion. Octonion, in turn, bought a piece of Class V Funding III. How did Citi and the collateral managers involved in these deals justify this daisy chain of buying?

@**eisingerj** · 2,499 followers

@**Jake_Bernstein** · 1,159 followers

1. http://www.propublica.org/article/banks-self-dealing-super-charged-financial-crisis/single
2. http://www.propublica.org/special/the-timeline-of-magnetars-deals

© Copyright 2011 Pro Publica Inc.

**Steal Our Stories**
Unless otherwise noted, you can republish our stories for free if you **follow these rules**.