UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____
                                                :
SECURITIES AND EXCHANGE COMMISSION,             :
                                                :
                              Plaintiff,         :
                                                :  11 Civ. 07387 (JSR)
                       v.                        :
                                                :  ECF Case
CITIGROUP GLOBAL MARKETS INC.,                   :
                                                :
                              Defendant.         :
_____:


**SEC'S MEMORANDUM OF LAW IN RESPONSE TO QUESTIONS
POSED BY THE COURT REGARDING PROPOSED SETTLEMENT**


                                    Matthew T. Martens
                                    Chief Litigation Counsel
                                    U.S. Securities and Exchange Commission
                                    100 F Street, NE
                                    Washington, DC 20549
                                    (202) 551-4481
                                    (202) 772-9362 (facsimile)
                                    Attorney for Plaintiff

Of Counsel:
Robert S. Khuzami
     Director, Division of Enforcement
Lorin L. Reisner
     Deputy Director, Division of Enforcement
Kenneth R. Lench
     Chief, Structured and New Products Unit,
     Division of Enforcement
Reid A. Muoio
     Deputy Chief, Structured and New Products Unit,
     Division of Enforcement


November 7, 2011

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ................................................................................................................. 2

    A.   The Complaint .................................................................................................... 2

    B.   The Proposed Consent Judgment ..................................................................... 2

ARGUMENT ...................................................................................................................... 3

I.   JUDICIAL REVIEW OF PROPOSED CONSENT DECREES IS LIMITED AND
    DEFERENTIAL ........................................................................................................ 3

II.   THE PROPOSED SETTLEMENT IS FAIR, ADEQUATE AND REASONABLE ............. 9

III.  RESPONSES TO THE COURT'S QUESTIONS .............................................................. 10

    1.   Why should the Court impose a judgment in a case in which the S.E.C.
        alleges a serious securities fraud but the defendant neither admits nor
        denies wrongdoing? ...................................................................................... 11

    2.   Given the S.E.C.'s statutory mandate to ensure transparency in the financial
        marketplace, is there an overriding public interest in determining whether
        the S.E.C.'s charges are true? Is the interest even stronger when there is
        no parallel criminal case? ............................................................................... 15

    3.   What was the total loss to the victims as a result of Citigroup's actions?
        How was this determined? If, as the S.E.C.'s submission states, the loss
        was "at least" $160 million, what was it at most? ........................................... 16

    4.   How was the amount of the proposed judgment determined? In particular, what
        calculations went into the determination of the $95 million penalty? Why, for
        example, is the penalty in this case less than one-fifth of the $535 million penalty
        assessed in *SEC v. Goldman Sachs & Co.*, No. 10 Civ. 3229, at *1 (S.D.N.Y. July
        20, 2010) (BSJ)? What reason is there to believe this proposed penalty will have a
        meaningful deterrent effect? .......................................................................... 18

    5.   The S.E.C.'s submission states that the S.E.C. has "identified . . . nine factors
        relevant to the assessment of whether to impose penalties against a corporation
        and, if so, in what amount." But the submission fails to particularize how the factors
        were applied in this case. Did the S.E.C. employ these factors in this case? If so,
        how should this case be analyzed under each of those nine factors? ................... 20

6.  The proposed judgment imposes injunctive relief against future violations. What does the S.E.C. do to maintain compliance? How many contempt proceedings against large financial entities has the S.E.C. brought in the past decade as a result of violations of prior consent judgments?........................................................22

7.  Why is the penalty in this case to be paid in large part by Citigroup and its shareholders rather than by the "culpable individual offenders acting for the corporation"? If the S.E.C. was for the most part unable to identify such alleged offenders, why was this?.................................................................................23

8.  What specific "control weaknesses" led to the acts alleged in the Complaint? How will the proposed "remedial undertakings" ensure that those acts do not occur again? ....................................................................................................................26

9.  How can a securities fraud of this nature and magnitude be the result simply of negligence? ...........................................................................................................27

CONCLUSION.........................................................................................................................28

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Binker v. Pennsylvania*, 977 F.2d 738 (3d Cir. 1992)........................................16

*C.F.T.C. v. Kelly*, No. 1:98-cv-05270-JSR (S.D.N.Y. Nov. 5, 1998)...............14

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974)................5, 6, 15

*D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001) ....................................6

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005) ...........................17

*E.E.O.C. v. America Tel. & Tel. Co.*, 419 F. Supp. 1022
    (E.D.Pa. 1976)...................................................................................................11

*E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884 (7th Cir. 1985) ...........16

*F.T.C. v. Diet Coffee, Inc.*, No. 1:08-cv-00094-JSR (S.D.N.Y. Jan. 10, 2008)................14

*F.T.C. v. Verity Int'l, Ltd.,* 443 F.3d 48 (2d Cir. 2006) ....................................17

*Gould v. Control Laser Corp.*, 866 F.2d 1391 (11th Cir. 1989)..........................8

*Heckler v. Chaney*, 470 U.S. 821 (1985) .................................................8, 9, 28

*Howard v. SEC*, 376 F.3d 1136 (D.C. Cir. 2004)...............................................27

*Janus Films, Inc. v. Miller*, 801 F.2d 578 (2d Cir. 1986) .............................4, 6

*Local Number 93 Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of
    Cleveland*, 478 U.S. 501 (1986)....................................................................28

*Maryland v. United States*, 460 U.S. 1001 (1983).........................................8, 9

*Mass. Sch. of Law at Andover, Inc. v. United States*, 118 F.3d 776
    (D.C. Cir. 1997) .................................................................................................7

*Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004) ...........7, 10

*Matter of S. L. E., Inc.*, 674 F.2d 359 (5th Cir. 1982)........................................8

*Newman v. Stein*, 464 F.2d 689 (2d Cir. 1972)..................................................5

*N.Y. Cent. & Hudson River R.R. Co. v. United States*, 212 U.S. 481 (1909) .............23, 24

*North Carolina v. Alford*, 400 U.S. 25 (1970) ...................................................................13

*Officers for Justice v. Civil Service Comm'n*, 688 F.2d 615 (9th Cir. 1982)....................16

*Ouellette v. Cardenas*, No. 10-3806-cv, 2011 WL 4425361
  (2d Cir. Sept. 23, 2011)...........................................................................................4, 5, 7

*In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501 (2d Cir. 2010)...............................17

*SEC v. Bank of Am. Corp.*, 653 F. Supp. 2d 507 (S.D.N.Y. 2009)..............................4, 25

*SEC v. Citigroup, Inc.,* No. 1:10-cv-01277 (D.D.C.) .......................................................21

*SEC v. Clifton*, 700 F.2d 744 (D.C. Cir. 1983) ..................................................... *passim*

*SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450 (2d Cir. 1996) ....................................17, 18

*SEC v. Fishbach Corp.*, 133 F.3d 170 (2d Cir. 1997)..................................................16, 17

*SEC v. Goldman Sachs & Co.*, 10-cv-3229-BSJ (S.D.N.Y. July 20, 2010) ...............18, 27

*SEC v. J.P. Morgan Sec., LLC*, 11-cv-4206-RMB (S.D.N.Y. Jun. 29, 2011) ..............9, 27

*SEC v. Koenig*, 557 F.3d 736 (7th Cir. 2009) ...................................................................19

*SEC v. Leffers*, 289 Fed. App'x 449, Nos. 07-0594-cv (L), 07-0596-cv (con),
  2008 WL 3841141 (2d Cir. 2008).................................................................................19

*SEC v. Moran*, 944 F. Supp. 286 (S.D.N.Y. 1996)...........................................................19

*SEC v. Randolph*, 564 F. Supp. 137 (N.D. Cal. 1983)......................................................16

*SEC v. Randolph*, 736 F.2d 525 (9th Cir. 1984) .................................................... *passim*

*SEC v. Vitesse Semiconductor Corp.*, 771 F. Supp. 2d 304 (S.D.N.Y. 2011)...4, 11, 13, 15

*SEC v. Wang*, 944 F.2d 80 (2d Cir. 1991) .............................................................. *passim*

*SEC v. Worldcom, Inc.*, 273 F. Supp. 2d 431 (S.D.N.Y. 2003).........................................7

*Swift & Co. v. United States*, 276 U.S. 311 (1928)................................................3, 11, 12

*United States ex rel. Dunn v. Casscles*, 494 F.2d 397 (2d Cir. 1974) .............................13

*United States v. A & P Trucking Co.*, 358 U.S. 121 (1958) ........................................24, 26

*United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409 (6th Cir. 1991) ....................5

*United States v. Armour & Co.*, 402 U.S. 673 (1971) ...............................................3, 5, 11

*United States v. Cannons Eng'g Corp.*, 899 F.2d 79 (1st Cir. 1990) ...................5, 6, 7, 13

*United States v. George F. Fish, Inc.,* 154 F.2d 798 (2d Cir. 1946)................................24

*United States v. Hooker Chemical & Plastics Corp.*, 776 F.2d 410 (2d Cir. 1985)............7

*United States v. Labiner*, No. 1:09-cr-00807-BMC (E.D.N.Y.).......................................23

*United States v. Metter*, No. 1:10-cr-00600-DLI (E.D.N.Y.) ...........................................23

*United States v. Microsoft Corp.*, 56 F.3d 1448 (D.C. Cir. 1995)............................ *passim*

*United States v. New Puck, LP*, 1:04-cv-05449-JSR (S.D.N.Y. July 14, 2004)................14

*United States v. Seymour Recycling Corp.*, 554 F. Supp. 1334 (S.D. Ind. 1982)..............13

*United States v. Shapiro*, No. 1:06-cr-00357-KMW (S.D.N.Y.).....................................23

*United States v. Oregon*, 913 F.2d 576 (9th Cir. 1990)...........................................5, 7, 16

*United States v. Twentieth Century Fox Film Corp.*, 882 F.2d 656 (2d Cir. 1989)..........24

*Universal City Studios, Inc. v. N.Y. Broadway Int'l Corp.*, 705 F.2d 94
   (2d Cir. 1983)...............................................................................................................23

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005) ...........5, 6, 7, 9, 18

*Williams v. Vukovich*, 720 F.2d 909 (6th Cir. 1983)..........................................................7

## ADMINISTRATIVE PROCEEDINGS

*In the Matter of Credit Suisse Alternative Capital, LLC and Samir H. Bhatt,* SEC Admin.
   Proceeding File No-3-14594 (Oct. 19, 2011) ..................................................................25

## FEDERAL STATUTES REGULATIONS AND RULES

Securities Act of 1933
   Section 2(a)(2)……………[15 U.S.C. § 77b(a)(2)].......................................................24

Section 17(a)………..……...[15 U.S.C. § 77q(a)] ...........................................1, 2, 24, 27
Section 20(b)……………......[15 U.S.C. §77t(b)]..............................................................24
Section 20(d) …………….....[15 U.S.C. § 77t(d)].........................................17, 18, 24, 25

Securities Exchange Act of 1934
    Section 2…………………..[15 U.S.C. § 78b] .......................................................................1
    Section 4…………………..[15 U.S.C. § 78d] ......................................................................1
    Section 15(d)………………[15 U.S.C. § 78o(d)].................................................................22

15 U.S.C. § 16(e) ..........................................................................................................4

18 U.S.C. § 402 ...........................................................................................................23

Debt Collections and Improvements Act of 1996, Pub. L. No. 104-134,
    110 Stat. 1321-373 (codified at 28 U.S.C. § 2461 note)…………………….....................19

17 C.F.R. § 201.1003, Subpart E, Table III ...............................................................19, 25

17 C.F.R. § 202.5(e) ................................................................................................12, 14

Fed. R. Crim. P. 11(b)(3) ...............................................................................................13

Fed. R. Crim. P. 42(b)...................................................................................................23

## OTHER REFERENCES

*Statement of the Securities and Exchange Commission Concerning Financial Penalties*,
    SEC Press Rel. No. 2006-4 (Jan 4, 2006) ........................................................................20

18A Wright & Miller, *Federal Practice and Procedure: Jurisdiction* § 4443
    (2d ed. 2002) .............................................................................................................11

*Black's Law Dictionary* 410 (6th ed. 1990).......................................................................11

Plaintiff U.S. Securities and Exchange Commission ("SEC" or "Commission") submits this memorandum of law in response to the questions posed in the Order dated October 27, 2011.

## PRELIMINARY STATEMENT

After a thorough investigation of a complex collateralized debt obligation ("CDO") transaction structured and marketed by Citigroup Global Markets, Inc., ("Citigroup"), the SEC concluded that the company violated Sections 17(a)(2) and (3) of the Securities Act of 1933 ("Securities Act"). Following extensive discussions and negotiations, the Commission and Citigroup agreed to a proposed settlement requiring that Citigroup make a monetary payment of $285 million, consisting of $160 million of disgorged profits it earned on the transaction, $30 million in prejudgment interest, and a $95 million civil penalty. All of the $285 million would be returned to harmed investors under the terms of the settlement. In addition, Citigroup would be enjoined from further violations of the securities law as well as required to implement a series of business reforms in connection with the structuring and marketing of mortgage-related securities.

The proposed consent judgment embodying this settlement is fair, adequate, and reasonable, and should be entered by this Court. The settlement is the product of arm's-length negotiations between sophisticated parties and is therefore entitled to a presumption of reasonableness. This presumption is heightened because it is the result of an enforcement effort by a federal government agency and has been approved by the Commission responsible for "insur[ing] the maintenance of fair and honest markets." 15 U.S.C. §§ 78b, 78d. The proposed settlement reasonably reflects the scope of relief likely to be obtained by the Commission under the applicable law if successful at a trial on the merits, also taking into account the litigation risks likely to be presented, the benefits of avoiding those risks, the willingness of Citigroup to consent to a judgment and not deny liability, and the opportunity to detail publicly in this forum

the facts that led the Commission to pursue this action. In addition, a settlement allows the Commission to devote resources that may have been required for this matter to investigate other fraud and misconduct resulting in loss and harm to investors not before the Court.  For all these reasons the proposed consent judgment is fair, adequate and reasonable.  Accordingly, the Commission respectfully requests that it be entered by the Court.

## BACKGROUND

### A.  The Complaint

 On October 19, 2011, the Commission filed a Complaint against Citigroup, alleging that the company violated Sections 17(a)(2) and (3) of the Securities Act in connection with its structuring and marketing of a largely synthetic CDO known as Class V Funding III ("Class V"). Compl. ¶¶ 1, 65. Specifically, the Complaint alleges that Citigroup's marketing materials for Class V represented that the CDO's portfolio of assets was selected by an independent collateral manager, without disclosing that Citigroup had exerted significant influence in the selection of approximately half of the CDO's assets and that Citigroup held a short position on those assets. *Id.* ¶ 2. Citigroup earned a fee of approximately $34 million for its work in structuring and marketing the Class V CDO. *Id.* ¶ 4. Approximately nine months after the transaction closed, the CDO experienced an event of default, resulting in hundreds of millions of dollars in losses to CDO investors. *Id.* ¶ 5. Citigroup realized net profits of at least $160 million from its fees and short positions in Class V collateral. *Id.*

### B.  The Proposed Consent Judgment

On the same day that the Commission filed the Complaint against Citigroup, it also submitted to the Court a proposed consent judgment signed by representatives of Citigroup. The proposed consent judgment provides that Citigroup, without admitting or denying the

Commission's allegations, agrees to the entry of an order enjoining it from violating Sections 17(a)(2) and (3) and requiring the payment of $285 million, consisting of disgorgement of $160 million, prejudgment interest of $30 million, and a civil penalty of $95 million. In addition, the proposed consent judgment requires that Citigroup implement certain undertakings to enhance its processes for the review and approval of mortgage-related securities, including CDO offerings.

## ARGUMENT

For the reasons discussed below, the Commission respectfully submits that the proposed consent judgment should be approved and entered in this matter.

## I.  JUDICIAL REVIEW OF PROPOSED CONSENT DECREES IS LIMITED AND DEFERENTIAL.

The use and entry of consent judgments has long been endorsed by the Supreme Court. *See*, *e.g.*, *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971); *Swift & Co. v. United States*, 276 U.S. 311, 324-27 (1928). More particularly, the lower courts have recognized the importance of consent judgments to the SEC's effective and efficient enforcement of the federal securities laws. The D.C. Circuit has explained the benefit of the Commission's consent decrees, including those entered on a no admit/deny basis:

> Because of its limited resources, the SEC has traditionally entered into consent decrees to settle most of its injunctive actions. Indeed, as the government pointed out at oral argument, over 90% of the SEC's cases are resolved by such decrees. While it gives up a number of advantages when it proceeds by injunction rather than by litigation, including the filing of findings of fact and court opinions clearly setting forth the reasons for the result in a particular case, the SEC is thus able to conserve its own and judicial resources; to obtain contempt remedies, including fines and prison terms, not available to it under its own statutory scheme; and to protect the public by informing potential investors that a certain person has violated SEC rules in the past and by reminding defendants that they must obey the law in the future. While the defendants in such cases give up the right to contest the need for an injunction, they receive significant benefits in return: they are permitted to settle the complaint against them without admitting or denying the SEC's allegations and they often seek and receive concessions concerning the violations to be alleged in the complaint, the language and factual

> allegations in the complaint, and the collateral, administrative consequences of the consent decree. We are reluctant to upset this balance of advantages and disadvantages.

*SEC v. Clifton*, 700 F.2d 744, 748 (D.C. Cir. 1983) (internal citations omitted); *see also SEC v. Randolph*, 736 F.2d 525, 529 (9th Cir. 1984). Similarly, the Second Circuit has observed that there is a "strong federal policy favoring the approval and enforcement of consent decrees." *SEC v. Wang*, 944 F.2d 80, 85 (2d Cir. 1991).

The scope of review of an SEC consent judgment presented to a district court for approval and entry is limited. In short, "'[u]nless a consent decree is unfair, inadequate, or unreasonable, it ought to be approved.'"[1] *SEC v. Wang*, 944 F.2d at 85 (quoting *SEC v. Randolph*, 736 F.2d at 529). The Second Circuit has made clear that, "when evaluating a settlement agreement, the court is not to substitute its judgment for that of the parties." *Ouellette v. Cardenas*, No. 10-3806-cv, 2011 WL 4425361, at *1 (2d Cir. Sept. 23, 2011) (quoting *City of*

---

[1]   Although the SEC strongly believes that the proposed consent judgment here is in the public interest, that is not part of applicable standard of judicial review. *Compare SEC v. Vitesse Semiconductor Corp.*, 771 F. Supp. 2d 304, 307 (S.D.N.Y. 2011); *SEC v. Bank of Am. Corp.*, 653 F. Supp. 2d 507, 508 (S.D.N.Y. 2009). As noted above, the Second Circuit has held that a consent decree in an SEC enforcement action "ought to be approved" so long as it is not "unfair, inadequate, or unreasonable." *SEC v. Wang*, 944 F.2d at 85 (internal quotation marks omitted). The Second Circuit did not include the "public interest" as part of the test to be applied by the courts. *See id.* In *SEC v. Randolph*, the district court attempted to import into the securities enforcement context a "public interest" standard of review of consent judgments that is statutorily mandated for antitrust actions brought by the Justice Department. 736 F.2d at 529. The Ninth Circuit rejected this attempt. While the Ninth Circuit agreed that SEC settlements should be in the "public interest," the court held that, on the question whether the settlement was in the public interest, the district "court should have deferred to the agency's decision that the decree is appropriate and simply ensured that the proposed judgment is reasonable." *Id.*
The Second Circuit has identified certain classes of cases in which a more searching evaluation of the settlement is to be made by the district court. *Janus Films, Inc. v. Miller*, 801 F.2d 578, 582 (2d Cir. 1986). The only government enforcement action included on that list is an antitrust action brought by the United States where, as noted above, there is a statutory mandate for the district court to evaluate the "public interest" in the settlement. *See id.* (citing 15 U.S.C. § 16(e)). But at least one circuit court has noted the "constitutional difficulties that inhere" in a "public interest" judicial review of proposed settlements in antitrust enforcement actions brought by the government. *See United States v. Microsoft Corp.*, 56 F.3d 1448, 1459 (D.C. Cir. 1995).

4

*Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974)). "The relevant standard, after all, is not whether the settlement is one which the court itself might have fashioned, or considers as ideal, but whether the proposed decree is fair, reasonable, and faithful to the objectives of the governing statute." *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990).

Accordingly, in reviewing a proposed consent decree, it is not a court's "function to determine whether this is the best possible settlement that could have been obtained, but only whether it is fair, adequate and reasonable." *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1436 (6th Cir. 1991); *see also SEC v. Randolph*, 736 F.2d at 529 (noting that "the district court should [not] have conditioned approval of the consent decree on what it considered to be the public's *best* interest."). "'[T]here is a range of reasonableness with respect to a settlement-a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion.'" *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 119 (2d Cir. 2005) (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)). "Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation." *Armour & Co.*, 402 U.S. at 681.

Thus, judicial review of a proposed consent decree should not involve a court attempting to resolve factual disputes in the matter. *United States v. Oregon*, 913 F.2d 576, 582 (9th Cir. 1990); *see also Ouellette*, 2011 WL 4425361, at *1 ("[W]hen evaluating a settlement agreement, the court is not . . . to turn consideration of the adequacy of the settlement 'into a trial or a

rehearsal of the trial.'" (quoting *City of Detroit*, 495 F.2d at 462)); *Janus Films, Inc. v. Miller*, 801 F.2d 578, 582 (2d Cir. 1986) (noting that "court makes no determination of the merits of the controversy"). Indeed, to require resolution of factual disputes as a condition of entering a consent decree "would emasculate the very purpose for which settlements are made." *City of Detroit*, 495 F.2d at 462 (internal quotation marks omitted). Accordingly, proposed consent decrees not requiring an admission of liability by the defendant, far from being suspect, are the norm and to be expected. *United States v. Microsoft*, 56 F.3d 1448, 1461 (D.C. Cir. 1995) (noting that "the district judge's criticism of [the defendant] for declining to admit that the practices charged in the complaint actually violated the antitrust laws was thus unjustified"); *SEC v. Clifton*, 700 F.2d at 748 (noting the "significant benefits" of, among other things, the no admit/deny provision in SEC consent decrees).

In addition, in reviewing a proposed consent decree, a district court should not "reach beyond the complaint to evaluate claims that the government did not make and to inquire as to why they were not made." *United States v. Microsoft*, 56 F.3d at 1459. And the district court should not "seek the kind of information concerning the government's investigation and settlement negotiations." *Id.* In other words, "the district court is not empowered to review the actions or behavior of the [government]; the court is only authorized to review the decree itself." *Id.* In short, "the district court must refrain from second-guessing the Executive Branch." *Cannons Eng'g*, 899 F.2d at 84.

Instead, "[a] court determines a settlement's fairness by looking at both the settlement's terms and the negotiating process leading to settlement." *Wal-Mart Stores*, 396 F.3d at 116; *see also D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001). "[O]nce the court is satisfied that the decree was the product of good faith, arms-length negotiations, a negotiated decree is

presumptively valid and the objecting party 'has a heavy burden of demonstrating that the decree is unreasonable.'" *Oregon*, 913 F.2d at 581 (quoting *Williams v. Vukovich*, 720 F.2d 909, 921 (6th Cir. 1983)). Stated another way, a "'presumption of fairness, adequacy, and reasonableness may attach to a . . . settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.'" *Ouellette*, 2011 WL 4425361, at *1 (quoting *Wal-Mart Stores*, 396 F.3d at 116); *see also Oregon*, 913 F.2d at 581 (same). Assuming the proposed consent judgment is the product of arm's-length negotiations, it should be rejected "'only if any of the terms appear ambiguous, if the enforcement mechanism is inadequate, if third parties will be positively injured, or if the decree otherwise makes a mockery of judicial power.'" *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1236 (D.C. Cir. 2004) (quoting *Mass. Sch. of Law at Andover, Inc. v. United States*, 118 F.3d 776, 783 (D.C. Cir. 1997)).

Furthermore, in reviewing the parties' proposed settlement, "the courts should pay deference to the judgment of the government agency that has negotiated and submitted the proposed judgment." *SEC v. Randolph*, 736 F.2d at 529; *see also United States v. Hooker Chemical & Plastics Corp.*, 776 F.2d 410, 411 (2d Cir. 1985) (affirming settlement with "no hesitation" given "the fact that the instant settlement has the approval of the government agencies charged with the enforcement of the" statutes at issue); *SEC v. Worldcom, Inc.*, 273 F. Supp. 2d 431, 436 (S.D.N.Y. 2003) ("[W]here one of the settling parties is a public agency, its determinations as to why and to what degree the settlement advances the public interest are entitled to substantial deference."). The federal policy in favor of settlements "has particular force where, as here, a government actor committed to the protection of the public interest has pulled the laboring oar in constructing the proposed settlement." *Cannons Eng'g*, 899 F.2d at 84.

This deferential posture in evaluating consent decrees negotiated by government agencies has constitutional underpinnings. *See United States v. Microsoft*, 56 F.3d at 1459 (noting the "constitutional difficulties that inhere" in judicial review of settlements for compliance with the "public interest"); *Maryland v. United States*, 460 U.S. 1001, 1005-06 (1983) (Rehnquist, J., dissenting from summary affirmance) (explaining the separation of powers problems created by a "public interest" judicial review of consent decrees). On the one hand, the decision whether and what to prosecute is a uniquely executive function. *Heckler v. Chaney*, 470 U.S. 821, 831 (1985) (The Supreme Court "has recognized on several occasions over many years an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."). Furthermore, the parties' willingness to settle a matter raises concerns about the presence of an ongoing case or controversy that is a prerequisite for a district court's jurisdiction under the Constitution. *See Gould v. Control Laser Corp.*, 866 F.2d 1391, 1392-93 (11th Cir. 1989) ("Settlement moots an action, although jurisdiction remains with the district court to enter a consent judgment."); *Matter of S. L. E., Inc.*, 674 F.2d 359, 364 (5th Cir. 1982) ("If a dispute has been settled or resolved . . . it is considered moot. With the designation of mootness comes the concomitant designation of non-justiciability, unless one of the exceptions inhere.").

In sum, in reaching a settlement,

[an] agency must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all. . . . The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities.

*Heckler*, 470 U.S. at 831-32. Furthermore, "[t]here is no standard by which the benefits to the public from a 'better' settlement of a lawsuit than the [agency] has negotiated can be balanced against the risk of an adverse decision, the need for a speedy resolution of the case, the benefits obtained in the settlement, and the availability of the [agency's] resources for other cases." *Maryland v. United States*, 460 U.S. at 1006 (Rehnquist, J., dissenting from summary affirmance). Therefore, "[t]he initial determination whether the consent decree is in the public interest is properly left to the SEC and its decision deserves [the court's] deference." *SEC v. Randolph*, 736 F.2d at 530.

## II. THE PROPOSED SETTLEMENT IS FAIR, ADEQUATE, AND REASONABLE.

Applying the legal principles set forth above, the Court should approve the proposed consent judgment as fair, adequate, and reasonable. As an initial matter, the proposed consent judgment here was negotiated at arm's length between parties represented by experienced counsel after a comprehensive investigation. As a result, a presumption of fairness, adequacy, and reasonableness attaches to the settlement. *See Wal-Mart Stores*, 396 F.3d at 116.[2] That presumption is warranted here. The proposed consent judgment results in a payment of $285 million by Citigroup. This amount reasonably reflects the monetary relief likely to be available to the Commission if successful at a trial on the merits, also taking into account the litigation risks, the benefits of avoiding those risks, and the wise allocation of agency resources to serve the interests of investors here as well as in other matters not before the Court. In addition, the

---

[2]    This standard was applied by Judge Berman in approving the settlement in *SEC v. J.P. Morgan Sec., LLC*, No. 11-CV-4206-RMB (S.D.N.Y. June 29, 2011), which also involved the fraudulent marketing and structuring of a CDO. There, Judge Berman approved the proposed judgment because "the settlement reached, after arm's-length negotiations between sophisticated parties, is, in the Court's view, another important step in the direction of the financial industry, along with the SEC itself, righting the wrongs and excesses of the recent financial crises." Tr. of 6/29/11 Hearing, at 7 (attached as Exhibit A to the Martens Declaration filed herewith).

consent judgment requires that Citigroup implement a series of enhancements of its processes for the review and approval of mortgage-related securities offerings and related disclosures. At the same time, the Complaint clearly "inform[s] potential investors that a certain [company] has violated SEC rules." *SEC v. Clifton*, 700 F.2d at 748. The "balancing of advantages and disadvantages" reflected in the proposed consent judgment reflects a fair, adequate, and reasonable resolution of this matter. *See id.*

Given the presumptive appropriateness of the proposed consent judgment, it should be rejected by the Court "only if any of the terms appear ambiguous, if the enforcement mechanism is inadequate, if third parties will be positively injured, or if the decree otherwise makes a mockery of judicial power." *Massachusetts v. Microsoft Corp.*, 373 F.3d at 1236 (internal quotation marks omitted). No such inadequacies are present. The terms of the consent judgment are clear and they may be enforced by this Court if the need arises. No third parties are injured by the settlement; indeed, the proposed resolution expressly provides for compensation to the victims of Citigroup's conduct through the creation of a Fair Fund. And, obviously, nothing about this resolution makes a mockery of the Court's power. Rather, the SEC's decision to invoke the authority of this Court reflects respect for and recognition of the Court's power. Accordingly, the proposed consent decree "ought to be approved.'" *SEC v. Wang*, 944 F.2d at 85 (internal quotation marks omitted).

## III.  RESPONSES TO THE COURT'S QUESTIONS.

The Court has posed a number of questions to the parties regarding the proposed settlement. The Commission's responses to those questions are set forth below:

1. **Why should the Court impose a judgment in a case in which the S.E.C. alleges a serious securities fraud but the defendant neither admits nor denies wrongdoing?**

As summarized above, the use and entry of consent judgments has long been endorsed by the Supreme Court. *See, e.g., Armour & Co.*, 402 U.S. at 681; *Swift & Co.*, 276 U.S. at 324-27. "[T]he central characteristic of a consent judgment is that the court has not actually resolved the substance of the issues presented." 18A Wright & Miller, *Federal Practice and Procedure: Jurisdiction and Related Matters* § 4443 (2d ed. 2002). Rather, a consent decree is a "judgment entered by consent of the parties whereby the defendant agrees to stop alleged illegal activity without admitting guilt or wrongdoing." *Black's Law Dictionary* 410 (6th ed. 1990). "[A] disclaimer of liability is, of course, a standard feature in consent decrees." *E.E.O.C. v. Am. Tel. & Tel. Co.*, 419 F. Supp. 1022, 1038 n.16 (E.D.Pa. 1976). Indeed, the Supreme Court expressly has endorsed the entry of consent decrees notwithstanding a defendant's explicit denial of material allegations of the complaint. *See Swift & Co.*, 276 U.S. 327. Accordingly, there is nothing unusual or untoward about a consent decree entered without an admission of wrongdoing by the defendant, and criticism of consent decrees for not including such an admission is "unjustified." *United States v. Microsoft*, 56 F.3d at 1461.

Consistent with this standard practice, the SEC has long utilized consent decrees in which defendants admit no wrongdoing. *SEC v. Vitesse Semiconductor Corp.*, 771 F. Supp. 2d 304, 308 (S.D.N.Y. 2011). While such consent decrees are entirely appropriate, the SEC became troubled by defendants' subsequent public denials of wrongdoing. Thus, in 1972, the Commission issued the following policy statement regarding its settlements:

> The Commission has adopted the policy that in any civil lawsuit brought by it or in any administrative proceeding of an accusatory nature pending before it, it is important to avoid creating, or permitting to be created, an impression that a decree is being entered or a sanction imposed, when the conduct alleged did not, in fact, occur. Accordingly, it hereby announces its policy not to permit a

11

> defendant or respondent to consent to a judgment or order that imposes a sanction while denying the allegations in the complaint or order for proceedings. In this regard, the Commission believes that a refusal to admit the allegations is equivalent to a denial, unless the defendant or respondent states that he neither admits nor denies the allegations.

17 C.F.R. § 202.5(e). In other words, while consent decrees often allow defendants to deny wrongdoing, *see*, *e.g.*, *Swift & Co.*, 276 U.S. 327, the SEC sought to preclude denials both in the consent decree itself and elsewhere. While the Commission does not require express admissions (given their collateral estoppel effects), the Commission has prohibited the denials that consent decrees often contain. Since this policy was announced, the Commission has, as a general matter, included in its proposed consent judgments a provision that the defendant neither admits *nor denies* the Commission's allegations.

Consistent with this policy, Citigroup and the Commission have entered into a no admit/ deny settlement here. It appears that this approach has succeeded in clearly conveying that the conduct alleged did in fact occur. The Complaint lays out in detail the alleged facts, Citigroup has paid nearly $300 million as a result, Citigroup has not denied the allegations, and Citigroup's public statement regarding the settlement focused on the fact that the company has "overhauled the risk management function, significantly reduced risk on the balance sheet, and returned to the basics of banking." Citigroup Announces Class V Settlement (Oct. 29, 2011), available at http://www.citigroup.com/citi/press/2011/111019c.htm.

Obviously, there are advantages and disadvantages to both parties in a no admit/deny consent judgment. The defendant is not subject to collateral estoppel with regard to the claims asserted, but at the same time investors are able to pursue any available private remedies in addition to the relief obtained by the SEC. On the other hand, the Commission is able to bring the matter to a speedy resolution, obtain compensation for victims in a timely manner, and

allocate its limited resources to bringing additional enforcement actions for the protection of still more investors. *See SEC v. Randolph*, 736 F.2d at 529-30. Courts repeatedly have recognized the balance of advantages and disadvantages in settlements entered pursuant to the no admit/deny policy and expressed a reluctance to upset that balance. *See*, *e.g.*, *Clifton*, 700 F.2d at 748; *SEC v. Randolph*, 736 F.2d 530; *United States v. Microsoft*, 56 F.3d at 1461; *Cannons Eng'g*, 899 F.3d at 90. The Commission respectfully submits that this Court should do the same.

This Court previously has questioned whether the SEC's no admit/deny policy is consistent with the position taken by the Justice Department when "[c]onfronted with the same choice." *Vitesse*, 771 F. Supp. 2d at 309. In particular, the Court referenced the policy of the Justice Department not to accept *nolo contendere* pleas in criminal cases. *Id.* But that is not the proper comparison and does not present the "same choice."[3] The Justice Department is confronted with the "same choice" – that is, whether to accept a consent judgment in the absence of an admission of liability – when it settles civil enforcement actions, not criminal prosecutions. And in the civil enforcement context, the Justice Department makes the "same choice" as the SEC, namely not to require admissions of liability by settling defendants. *See*, *e.g.*, *United States v. Microsoft*, 56 F.3d at 1461 (noting that defendant did not admit wrongdoing for the conduct that was the subject of a consent decree with the Justice Department); *United States v. Seymour Recycling Corp.*, 554 F. Supp. 1334, 1348 (S.D. Ind. 1982) (entering, in case brought by Justice

---

[3]      Guilty pleas in criminal cases do not present the Justice Department with the "same choice" as is presented in civil enforcement cases because the Federal Rules of Criminal Procedure and constitutional law limit the conditions under which criminal punishment can be imposed. Federal Rule of Criminal Procedure 11(b)(3) requires that judgment be entered on a guilty plea only after a district court finds a "factual basis" for the plea, and even a *nolo contendere* plea can be accepted only if there is a factual basis for the defendant's guilt. *See North Carolina v. Alford*, 400 U.S. 25, 38 (1970) (permitting *nolo contendere* pleas "[i]n view of the strong factual basis for the plea"); *United States ex rel. Dunn v. Casscles*, 494 F.2d 397, 399-40 (2d Cir. 1974) (same).

Department, a consent decree expressly providing that the defendants "do not admit . . . liability or fault"). In fact, the Justice Department often obtains consent decrees in civil enforcement actions in which the defendant expressly and repeatedly *denies* liability. *See United States v. New Puck, LP*, No. 1:04-cv-05449-JSR, at 2 (S.D.N.Y. July 14, 2004) (consent decree providing that "the defendant denies liability"). Other federal agencies similarly obtain consent decrees that contain no admission of wrongdoing. *See, e.g.*, *F.T.C. v. Diet Coffee, Inc.*, No. 1:08-cv-00094-JSR (S.D.N.Y. Jan. 10, 2008) (providing that defendant agrees to entry of order "without admitting the allegations of the Commission's Complaint"); *C.F.T.C. v. Kelly*, No. 1:98-cv-05270-JSR (S.D.N.Y. Nov. 5, 1998) (consent order providing that defendant "neither admit[s] or den[ies] any of the allegations of the Complaint").[4]

Thus, the SEC's policy with regard to no admit/deny consent decrees reflects the Commission's effort to go beyond its fellow federal agencies to "avoid creating, or permitting to be created," confusion over the factual accuracy of the Commission's allegations. *See* 17 C.F.R. § 202.5(e). The Commission's approach to consent decrees is more robust than that of other federal agencies, which generally do not preclude a defendant from denying the agency's allegations in enforcement actions and often include express denials within the consent decrees. This Court should not upset the balance that the SEC has attempted to strike in its no admit/deny approach to settlements. *See SEC v. Clifton*, 700 F.2d at 748.

---

[4]      Copies of the consent decrees entered in these matters are attached as Exhibits B, C, and D to the Martens Declaration filed herewith.

**2.   Given the S.E.C.'s statutory mandate to ensure transparency in the financial marketplace, is there an overriding public interest in determining whether the S.E.C's charges are true? Is the interest even stronger when there is no parallel criminal case?**

The interest in providing transparency regarding misconduct by companies in the securities industry is accomplished by the public filing of the allegations in the Commission's Complaint, which Citigroup has not denied. *See SEC v. Clifton,* 700 F.2d at 748 (explaining that a consent decree serves to "protect the public by informing potential investors that a certain person has violated SEC rules in the past"). As explained above, the detailed allegations of the Complaint, the substantial payment by Citigroup, the company's lack of a denial of the allegations, and Citigroup's public statement regarding the matter have put the public on notice as to Citigroup's conduct. *See supra* at 12.

At the same time, it is worth noting that there is ongoing litigation brought by the SEC against former Citigroup employee Brian Stoker, which provides a vehicle for resolution of the Commission's allegations. *See SEC v. Brian H. Stoker*, No. 11 Civ. 07388 (S.D.N.Y.). The Commission fully anticipates that the action against Mr. Stoker will continue through resolution on the merits. Accordingly, whatever public interest is served by a factual resolution of any disputed issues is likely to be realized in the related proceedings against Mr. Stoker. *Cf. Vitesse*, 771 F. Supp. 2d at 310 (finding public interest in a factual determination of the SEC's allegations against a corporate defendant was satisfied by resolution of criminal charges against individual defendants).

Interpreting the interest in transparency to require something akin to a factual resolution of the SEC's claims against Citigroup would run afoul of the Second Circuit's command that a settlement hearing "not be turned into a trial or a rehearsal of the trial" and "would emasculate the very purpose for which settlements are made." *City of Detroit*, 495 F.2d at 462 (internal

quotation marks omitted).[5] The Second Circuit has made clear that so long as a proposed consent decree is not "unfair, inadequate, or unreasonable, it ought to be entered." *SEC v. Wang*, 944 F.2d at 85 (internal quotation marks omitted). "[W]hether the consent decree is in the public interest is best left to the SEC." *SEC v. Randolph*, 736 F.2d at 530. The suggestion that the SEC's statutory mandate empowers the Court to more closely scrutinize the SEC's proposed consent decrees is much the same rationale upon which the district court relied in *SEC v. Randolph*, 564 F. Supp. 137, 140 (N.D. Cal. 1983), and rejected by the court of appeals in *SEC v. Randolph*, 736 F.2d at 529. In that case, "[t]he district court believed that the purposes of the securities laws . . . required it to closely scrutinize the proposed decree to see if it was in the public's best interest." *Id.* The Ninth Circuit expressly rejected that argument, concluding that the district court "should have deferred to the agency's decision that the decree is appropriate and simply ensured that the proposed judgment is reasonable." *Id.* So too here.

3. **What was the total loss to the victims as a result of Citigroup's actions? How was this determined? If, as the S.E.C.'s submission states, the loss was "at least" $160 million, what was it at most?**

The law provides two financial remedies to the SEC in enforcement actions. First, the SEC may obtain disgorgement of a defendant's ill-gotten gains. *See, e.g., SEC v. Fishbach Corp.*, 133 F.3d 170, 175 (2d Cir. 1997) ("As an exercise of its equity powers, the court may order wrongdoers to disgorge their fraudulently obtained profits."). Second, the Commission may obtain civil monetary penalties against a defendant in specified limited dollar amounts or, in

---

[5]      *See also Binker v. Pennsylvania*, 977 F.2d 738, 752 (3d Cir. 1992) ("'Neither the trial court nor [the appellate] court is to reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute.'" (quoting *Officers for Justice v. Civil Service Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982)); *Oregon*, 913 F.2d at 582 ("The reviewing court should not determine contested issues of fact that underlie the dispute."); *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985) ("The district court should refrain from resolving the merits of the controversy or making a precise determination of the parties' respective legal rights.").

certain instances, in an amount measured by the gain to the defendant.  *See* 15 U.S.C. § 77t(d).

As a general rule, the Commission does not recover "damages" suffered by victims of a

securities fraud scheme. *See SEC v. Fishbach*, 133 F.3d at 176 (holding that "the measure of

disgorgement need not be tied to the losses suffered by defrauded investors"); *SEC v. First

Jersey Sec., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996) (explaining that disgorgement remedy "is

unlike an award of damages"); *SEC v. Wang*, 944 F.2d at 81 (noting that the disgorgement order

in an SEC enforcement action "is not focused on those who have been duped out of their

money," but instead "is to ensure that those guilty of securities fraud do not profit from their ill-

gotten gains").[6] As a result, the precise calculation of investor losses is not required in

connection with the resolution of an enforcement action brought by the SEC.

The Complaint here states that investors "lost several hundred million dollars" on the

Class V CDO transaction. Compl. ¶ 5. Determination of the precise amount of investor losses as

a result of Citigroup's actions is a difficult and imprecise exercise not contemplated by the

statutory scheme or the applicable remedial provisions. It is reasonable to estimate, however, that

total investor loss or expected loss with respect to the Class V CDO transaction is in excess of

$700 million. As this Court is certainly aware, total losses to investors in a transaction are not

necessarily the same as total losses to investors "as a result of" a defendant's improper actions.

*See In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501, 509-10 (2d Cir. 2010) (distinguishing

between "transaction causation" and "loss causation"). A determination of the latter would

require proof that Citigroup's material misrepresentations or omissions were the proximate cause

of the economic loss suffered by harmed investors, as opposed to other causes. *See Dura

Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346 (2005). Because as noted above loss

---

[6]      *But see F.T.C. v. Verity Int'l, Ltd.*, 443 F.3d 48, 66 (2d Cir. 2006) (assuming without
deciding that "equitable restitution" is available in a government enforcement action).

causation is neither an element of SEC enforcement actions nor the proper measure of its potential recovery under the applicable statutory provisions, the Commission did not devote resources to calculating proximate causation, which often entails a complex evaluation of a variety of external events and their impact on alleged losses.

The Court's question suggests that the Commission has identified investor losses of at least $160 million. That is not what the Commission asserted in the Complaint or the Memorandum in Support of Proposed Settlement. What both of those filings state is that Citigroup, as a result of its short position in the assets in the Class V CDO portfolio and its structuring fee, realized net *profits* of at least $160 million.[7] Compl. ¶ 5; Mem. at 6. It is this amount that forms the basis for the disgorgement figure here. That is entirely consistent with the applicable law. *See SEC v. Wang*, 944 F.2d at 81 (explaining that disgorgement "is to ensure that those guilty of securities fraud do not profit from their ill-gotten gains").

**4.  How was the amount of the proposed judgment determined? In particular, what calculations went into the determination of the $95 million penalty? Why, for example, is the penalty in this case less than one-fifth of the $535 million penalty assessed in *SEC v. Goldman Sachs & Co.*, No. 10 Civ. 3229, at \*1 (S.D.N.Y. July 20, 2010) (BSJ)? What reason is there to believe this proposed penalty will have a meaningful deterrent effect?**

The Securities Act provides that, in cases involving fraud by a corporation, a civil monetary penalty may be imposed in an amount of $650,000 per violation or up to "the gross amount of pecuniary gain to such defendant as a result of the violation." 15 U.S.C. § 77t(d)(2).[8]

---

[7]     The Complaint provides that Citigroup realized "at least" $160 million in profits as a result of this transaction. The Second Circuit has held that a "reasonable approximation" of the disgorgement figure is sufficient. *SEC v. First Jersey Sec.*, 101 F.3d at 1475. Settlements are often reflective of the difficulty of proving not only liability, but also of the amount of financial relief. *See Wal-Mart Stores*, 396 F.3d at 119 (finding settlement justified by the "significant challenges in proving damages").

[8]     The Securities Act provides for a maximum penalty against a corporation of the greater of "$500,000" or the gross amount of pecuniary gain. 15 U.S.C. § 77t(d)(2)(C). The Debt

In other words, the statutory maximum penalty that generally may be imposed is roughly equivalent to the amount of disgorgement and prejudgment interest. *See SEC v. Leffers*, 289 F. App'x 449, 452 (2d Cir. 2008); *SEC v. Koenig*, 557 F.3d 736, 744-45 (7th Cir. 2009). In this case, then, a reasonable calculation of the maximum penalty available under the Securities Act is $190 million. As in any case, the penalty actually sought by the SEC reflects the consideration of deterrent impact and a variety of other factors discussed in further detail below.

The proposed settlement with Citigroup – like the settlements with Goldman Sachs and J.P. Morgan, *see infra* at 27 – resulted from an extensive, industry-wide investigation into certain abuses that contributed to the recent financial crisis. Given these substantial investigative efforts, the SEC is well-positioned to make comparative judgments regarding the relative culpability of the entities and individuals involved. With regard to the penalty imposed in *SEC v. Goldman Sachs & Co.*, Goldman Sachs was charged with scienter-based violations of the securities laws. As a general rule, scienter-based violations are worthy of a more significant sanction. *See SEC v. Moran*, 944 F. Supp. 286, 297 (S.D.N.Y. 1996) (finding that a lesser penalty was appropriate because "there is an unmistakable difference between conduct which negligently operates as a fraud when compared to conduct engaged in with intent to defraud"). In addition, other factors, including whether a defendant clearly has articulated a willingness to settle prior to the filing of a complaint, is a factor that may be considered.

---

Collections and Improvements Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321-373 (codified at 28 U.S.C. § 2461 note), however, requires federal agencies to adjust penalties every four years based on changes in the Consumer Price Index.  For violations occurring between February 15, 2005 and March 3, 2009, the maximum penalty for a corporation is $650,000. *See* 17 C.F.R. § 201.1003, Subpart E, Table III (Feb. 14, 2005).

**5. The S.E.C.'s submission states that the S.E.C. has "identified . . . nine factors relevant to the assessment of whether to impose penalties against a corporation and, if so, in what amount." But the submission fails to particularize how the factors were applied in this case. Did the S.E.C. employ these factors in this case? If so, how should this case be analyzed under each of those nine factors?**

As noted in its initial submission to the Court, the Commission has identified nine factors relevant to the assessment of whether to seek that a monetary penalty be imposed on a corporation and, if so, in what amount. *See Statement of the Securities and Exchange Commission Concerning Financial Penalties*, SEC Rel. No. 2006-4 (Jan. 4, 2006). These factors, among others, were considered in determining the appropriate penalty in this case.[9] An application of the factors here follows:

(1) *The presence or absence of a direct benefit to the corporation as a result of the violation.* In this case, Citigroup directly benefited in the amount of approximately $160 million as a result of the Class V CDO transaction. The magnitude of this direct benefit to Citigroup counsels in favor of a significant monetary penalty.

(2) *The degree to which the penalty will recompense or further harm the injured shareholders.* As set forth below, while Citigroup shareholders will indirectly bear the cost of any penalty imposed on the company, that is not an unjust result where, as here, Citigroup shareholders were the indirect financial beneficiaries of Citigroup's misconduct. The proposed resolution here allows for the creation of a Fair Fund to provide recompense to harmed Class V CDO investors. In this case, it is the SEC's intent to initiate a Fair Fund. Thus, the imposition of a penalty here serves to provide recompense to the victims.

(3) *The need to deter the particular type of offense.* An important deterrent effect was the investigation and filing of this action, which revealed Citigroup's CDO business practices and the inadequate and misleading representations to investors in the disclosure materials at issue. At the same time, the imposition of a substantial penalty, in addition to a disgorgement payment, as the result of the Class V transaction can serve to alter the financial calculus of Citigroup and other companies that would engage in similar transactions in the future.

---

[9] The Commission's penalty guidance was issued in the context of an enforcement action against a defendant that was a non-registrant and does not expressly state whether it extends to regulated entities. The factors identified in the guidance nevertheless may serve as a useful touchstone with respect to a regulated entity.

(4) *The extent of injury to innocent parties.* As noted in the Complaint, Citigroup's misconduct here resulted in hundreds of millions of dollars of losses to the Class V CDO investors. This weighs in favor of a significant monetary sanction in this case.

(5) *Whether complicity in the violation is widespread throughout the corporation.* The Commission did not uncover evidence to support a conclusion that there was widespread illicit conduct by individuals throughout Citigroup in connection with the Class V CDO transaction. This weighs in favor of a more reduced monetary sanction.

(6) *The level of intent on the part of the perpetrators.* As reflected in the claims in both the action filed against Citigroup and the action against Mr. Stoker, the Commission's conclusion was that the evidence did not clearly establish an intent to defraud. Accordingly, this counsels in favor of a more reduced monetary sanction.

(7) *The difficulty in detecting the particular type of offense.* The investigation of securities law violations concerning the structuring and marketing of CDOs is difficult given the complexity of the transactions and the lack of transparency in the CDO market. This weighs in favor of a more significant monetary sanction in those instances where violations are detected in order to ensure adequate deterrence.

(8) *Presence or lack of remedial steps by the corporation.* In this case, the proposed consent judgment includes a series of undertakings by Citigroup designed to prevent the repeat of this conduct by Citigroup in the future. Such remedial steps counsel in favor of a more reduced monetary sanction. At the same time, Citigroup has been the subject of prior SEC enforcement actions, *see*, *e.g.*, *SEC v. Citigroup Inc.*, No. 1:10-cv-01277 (D.D.C.), and recidivism is taken into account by the Commission in determining the appropriate penalty in a given case.

(9) *Extent of cooperation with Commission and other law enforcement.* Citigroup did not provide an extraordinary level of cooperation to the Commission in the investigation of this matter. Thus, this factor is neutral.

In determining the appropriate penalty in this case, the Commission also considered the litigation risk in pursuing this matter through trial and appeal. As set out in the Complaint, the Commission determined that Citigroup's marketing materials with regard to the Class V transaction were materially misleading in that they represented that "[t]he composition of the Eligible Collateral Debt Securities will be determined by the selections of the Manager." *See*,

21

*e.g.*, Class V Funding III Offering Circular, at 14 (Feb. 26, 2007). In fact, as the Complaint

alleges, Citigroup exercised significant influence in the asset selection process at a time when

Citigroup had decided to take short positions on the assets in the Class V portfolio. Compl. ¶¶ 2,

30, 34. Citigroup argued during the investigation of this matter both that the collateral manager

did "select" the portfolio and that the offering circular disclosure that Citigroup "may" take short

positions on the Class V assets was sufficient.  Class V Funding III Offering Circular, at 88

("The Initial CDS Asset Counterparty may provide CDS Assets as an intermediary with

matching off-setting positions requested by the Manager or may provide CDS Assets alone

without any off-setting positions."). While the Commission rejects these arguments, they would

have to be addressed in the context of a litigated proceeding.[10]

For all these reasons, the Commission concluded that monetary relief in the amount of

$285 million, including a $95 million penalty, together with the other remedial elements of the

proposed settlement, reflected a fair, adequate, and reasonable resolution of this matter.

**6.   The proposed judgment imposes injunctive relief against future violations. What
does the S.E.C. do to maintain compliance? How many contempt proceedings
against large financial entities has the S.E.C. brought in the past decade as a result
of violations of prior consent judgments?**

The corporate defendant in this case is a broker-dealer registered with the Commission.

As a registered broker-dealer, Citigroup is subject to examination by the Commission, *see* 15

U.S.C. § 78*o*(d), and the Commission's Office of Compliance Inspections and Examinations

("OCIE") regularly conducts such exams. If, in the course of an examination, the OCIE staff

uncovers evidence of a violation, that evidence may be referred to SEC enforcement staff.

---

[10]     A further public airing of the Commission's assessment of the litigation risk present in
this matter is particularly inappropriate in light of the ongoing litigation against Mr. Stoker. *See
United States v. Microsoft*, 56 F.3d at 1459 (noting that it is improper for the court to "inquir[e]
into the mental processes of administrative decisionmakers" (internal quotation marks omitted)).

Civil contempt is a remedy available to the SEC in the event either (1) that a defendant is engaging in an ongoing violation of an injunction, or (2) compensation is due the SEC as a result of a defendant's violation of an injunction. *See Universal City Studios, Inc. v. N.Y. Broadway Int'l Corp.*, 705 F.2d 94, 96 (2d Cir. 1983). Because alternative effective remedies often are available, including the filing of an independent action with corresponding legal and equitable relief, the Commission has not frequently pursued civil contempt proceedings and does not appear to have initiated such proceedings against a "large financial entity" in the last ten years.[11] However, prior unlawful conduct by a corporate entity is considered in determining the appropriate penalty in any subsequent enforcement action. *See supra* at 21.

**7. Why is the penalty in this case to be paid in large part by Citigroup and its shareholders rather than by the "culpable individual offenders acting for the corporation"? If the S.E.C. was for the most part unable to identify such alleged offenders, why was this?**

The civil (and criminal) liability of corporations for the wrongful acts of their agents is well-established under federal law. *See N.Y. Cent. & Hudson River R.R. Co. v. United States*, 212 U.S. 481, 493 (1909) ("A corporation cannot be arrested and imprisoned in either civil or criminal proceedings, but its property may be taken either as compensation for a private wrong or as punishment for a public wrong."). As the Second Circuit has explained, holding a

---

[11]     Criminal contempt is a remedy available to punish past violations of an injunction. *See Universal City*, 705 F.2d at 96. The Commission does not have the legal authority to prosecute criminal contempt violations. *See* Fed. R. Crim. P. 42(b); *Universal City*, 705 F.2d at 96. A criminal contempt conviction also would require proof that the defendant "willfully" violated an injunction. 18 U.S.C. § 402. In the event that evidence of such a willful violation is uncovered, the criminal authorities' preferred course of action may be to bring a substantive criminal charge for the violation at issue rather than a criminal contempt proceeding. Criminal authorities nevertheless have brought criminal contempt charges based on violations of SEC injunctions and sought sentencing enhancements based on such violations. *See, e.g.*, *United States v. Labiner, et al.*, No. 1:09-cr-00807-BMC (E.D.N.Y.) (charging criminal contempt for violation of SEC injunction); *United States v. Metter, et al.*, No. 1:10-cr-00600-DLI (E.D.N.Y.) (charging criminal contempt for violation of SEC injunction); *United States v. Shapiro, et al.*, No. 1:06-cr-00357-KMW (S.D.N.Y.).

corporation responsible for the wrongs of its agents and employees "encourages companies to establish compliance programs." *United States v. Twentieth Century Fox Film Corp.*, 882 F.2d 656, 661 (2d Cir. 1989); *see also United States v. George F. Fish, Inc.*, 154 F.2d 798, 801 (2d Cir. 1946) (holding that "to deny the possibility of corporate responsibility for the acts of minor employees is to immunize the offender who really benefits, and open wide the door for evasion"). The Supreme Court has gone further, explaining that corporate liability is appropriate because "[t]he treasury of the business may not with impunity obtain the fruits of violations which are committed knowingly by agents of the entity in the scope of their employment. Thus pressure is brought on those who own the entity to see to it that their agents abide by the law." *United States v. A & P Trucking Co.*, 358 U.S. 121, 126 (1958). In short, imposing monetary penalties on a company for the acts of agents is "in the interest of public policy." *N.Y. Cent.*, 212 U.S. at 493.

Consistent with this long line of decisions and the statutory authority in the Securities Act itself,[12] the Commission often pursues claims and remedies against corporations. The extent to which the Commission has identified or asserted claims against individual offenders is not a proper basis for evaluating the proposed settlement with Citigroup. A district court may not "reach beyond the complaint to evaluate claims that the government did *not* make and to inquire as to why they were not made." *United States v. Microsoft*, 56 F.3d at 1459. Nor is it appropriate for the Court to "seek the kind of information concerning the government's investigation." *Id.*

There are nevertheless two important observations to be made here regarding the liability of culpable individuals. First, the SEC has filed claims against an individual employed by

---

[12]     The Securities Act imposes liability on "any person" who violates its provisions, including Section 17(a). *See* 15 U.S.C. §§ 77q(a), 77t(b), (d). A "person" is defined by the Act as including a corporation. *Id.* § 77b(a)(2).

Citigroup in connection with the transaction at issue. *See SEC v. Brian H. Stoker*, No. 11 Civ. 07388 (S.D.N.Y.). In addition, the SEC filed claims against a collateral manager and an individual who worked for the collateral manager for the same transaction. *See In the Matter of Credit Suisse Alternative Capital, LLC and Samir H. Bhatt*, SEC Admin. Proceeding File No. 3-14594 (Oct. 19, 2011). <u>Second</u>, an individual can be required to pay a civil penalty for violations of the Securities Act only up to the greater of $130,000 or "the gross amount of pecuniary gain *to such defendant*." 15 U.S.C. § 77t(d)(2)(C) (emphasis added).[13] Given the nature of the allegations in this case, the gross amount of pecuniary gain to any single individual would obviously be small in comparison to the gross amount of pecuniary gain to the culpable corporate entity. Accordingly, if a substantial civil monetary penalty commensurate with the seriousness of the misconduct here is to be paid, it must be paid by the corporate defendant that benefited from the misconduct.

Furthermore, the payment of the penalty by Citigroup does not unfairly harm the company's shareholders. Although Citigroup shareholders indirectly may bear the burden of any penalty paid by the company, in this instance, Citigroup shareholders were not the victims of the fraudulent transaction, but rather its indirect financial beneficiaries. *Compare SEC v. Bank of Am. Corp.*, 653 F. Supp. 2d 507, 509 (S.D.N.Y. 2009) (rejecting a proposed settlement because it required "that the shareholders who were the victims of the Bank's alleged misconduct now pay the penalty for that misconduct"). The securities fraud perpetrated by Citigroup victimized investors in the Class V CDO, not the shareholders of Citigroup itself. *See* Compl. ¶ 2. To the extent the fraud succeeded, Citigroup shareholders received an indirect financial benefit at the

---

[13]     *See supra* note 8. For violations occurring between February 15, 2005 and March 3, 2009, the maximum penalty for an individual is $130,000. *See* 17 C.F.R. § 201.1003, Subpart E, Table III (Feb. 14, 2005).

expense of the CDO investors. In these circumstances, pursuit of an enforcement action to obtain

disgorgement from Citigroup is entirely appropriate, as "[t]he treasury of the business may not

with impunity obtain the fruits of violations which are committed knowingly by agents of the

entity in the scope of their employment." *A & P Trucking*, 358 U.S. at 126. And a civil penalty is

also appropriate to incentivize "those who own the entity to see to it that their agents abide by the

law." *Id.*

8.  **What specific "control weaknesses" led to the acts alleged in the Complaint? How will the proposed "remedial undertakings" ensure that those acts do not occur again?**

   In referencing "control weaknesses," the Commission was referring to the failure to

ensure that complete and accurate disclosures were made to investors regarding the selection of

the Class V CDO portfolio.

   The proposed consent decree includes undertakings designed to ensure that Citigroup

makes appropriate disclosures in connection with future mortgage-related securities transactions.

First, the role of the relevant Capital Markets Approval Committee or Commitment Committee

will be expanded and processes put in place to ensure that written marketing materials for

mortgage securities do not include any material misstatement or omissions. Second, in-house

legal or compliance personnel will review all marketing materials and certain other written

materials used by Citigroup in connection with mortgage securities offerings. Third, for all

mortgage securities offerings where Citigroup retains outside counsel, such outside counsel will

be required to review all written marketing materials and offering circulars/prospectuses and be

provided with documents sufficient to reflect all material terms of the transaction. Fourth,

Citigroup will be required to conduct annual internal compliance audits and certify annually, in

writing, compliance in all material respects with the undertakings. The proposed consent decree provides that the undertakings shall expire in three years.

The undertakings in the proposed consent judgment against Citigroup mirror closely undertakings in the consent decrees entered in *SEC v. Goldman Sachs & Co.*, No. 10-CV-3229-BSJ (S.D.N.Y July 20, 2010), and in *SEC v. J.P. Morgan Sec., LLC*, No. 11-CV-4206-RMB (S.D.N.Y. June 29, 2011). Those cases similarly involved misleading statements regarding portfolio selection in marketing materials for CDOs. Together with the proposed undertakings against Citigroup, the undertakings against Goldman Sachs and J.P. Morgan were developed to respond to misconduct relating to the recent financial crisis and ensure that investors receive accurate and complete disclosure in connection with mortgage securities offerings.

**9. How can a securities fraud of this nature and magnitude be the result simply of negligence?**

As discussed above, Citigroup has identified certain disclosures made to Class V investors regarding short positions that "may" be taken by Citigroup as well as arguments that could be raised regarding the meaning of the term "select." *See supra* at 21-22. In addition, whether actions were undertaken with scienter or were instead the result of negligence can be impacted by the role that counsel played in the transaction. *See Howard v. SEC*, 376 F.3d 1136, 1147-48 (D.C. Cir. 2004).

Ultimately, a district court's role in evaluating a proposed settlement is to consider the reasonableness of the settlement of the claims that the Commission has determined are appropriate. Evaluation of a settlement is not an opportunity to "reach beyond the complaint to evaluate claims that the government did *not* make and to inquire as to why they were not made." *United States v. Microsoft*, 56 F.3d at 1459; *see also Local No. 93 Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 525 (1986) (holding that a "consent decree

27

must come within the general scope of the case made by the pleadings" (internal quotation marks omitted)).

Based on a careful evaluation of the evidence, the litigation risks, the benefits to investors of the proposed settlement, the agency's programmatic objectives, and the allocation of agency resources, the Commission determined that it was appropriate to charge Citigroup with violations of Sections 17(a)(2) and (3). Those claims are firmly supported by the factual allegations set forth in the Complaint. The Commission's decision not to pursue additional charges is "committed to an agency's absolute discretion." *Heckler*, 470 U.S. at 831, and is not a proper area of inquiry in evaluating a consent decree, *Microsoft*, 56 F.3d at 1459. The proposed resolution of the claims asserted by the Commission is, for the reasons set forth above, fair, adequate, and reasonable. Accordingly, the consent decree "ought to be approved." *SEC v. Wang*, 944 F.2d at 85 (internal quotation marks omitted).

## CONCLUSION

For the reasons described above, the settlement should be approved and the proposed consent decree should be entered.

Dated:  Washington, D.C.
             November 7, 2011

Respectfully submitted,

*/s/ Matthew T. Martens*
Matthew T. Martens (MM5450)
Chief Litigation Counsel
U.S. Securities and Exchange
Commission – Enforcement Division
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4481
(202) 772-9362 (fax)
martensm@sec.gov

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 7, 2011, I electronically filed the foregoing SEC'S

MEMORANDUM OF LAW IN RESPONSE TO QUESTIONS POSED BY THE COURT

REGARDING PROPOSED SETTLEMENT using the CM/ECF system, which will send

notification of such filing to the following: Brad Scott Karp, Theodore V. Wells, Jr. and Susanna

Michele Buergel, counsel for defendant, Citigroup Global Markets, Inc.


<u>/s/ *Matthew T. Martens*</u>
Matthew T. Martens