```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- x
U.S. SECURITIES AND EXCHANGE          :
COMMISSION,                           :    11 Civ. 7387 (JSR)
                                      :
              Plaintiff,              :    OPINION AND ORDER
                                      :
         -v-                          :
                                      :
CITIGROUP GLOBAL MARKETS INC.,        :
                                      :
              Defendant.              :
------------------------------------- x
```

JED S. RAKOFF, U.S.D.J.

On October 19, 2011, the U.S. Securities and Exchange Commission (the "S.E.C.") filed this lawsuit, accusing defendant Citigroup Global Markets Inc. ("Citigroup") of a substantial securities fraud. According to the S.E.C.'s Complaint, after Citigroup realized in early 2007 that the market for mortgage-backed securities was beginning to weaken, Citigroup created a billion-dollar Fund (known as "Class V Funding III") that allowed it to dump some dubious assets on misinformed investors. This was accomplished by Citigroup's misrepresenting that the Fund's assets were attractive investments rigorously selected by an independent investment adviser, whereas in fact Citigroup had arranged to include in the portfolio a substantial percentage of negatively projected assets and had then taken a short position in those very assets it had helped select. Complaint ¶¶ 1, 2, 58. Having structured the Fund as a vehicle for unloading these

1

dubious assets on unwitting investors, id. ¶ 44, Citigroup realized net profits of around $160 million, id. ¶ 63, whereas the investors, as the S.E.C. later revealed, lost more than $700 million. See S.E.C.'s Memorandum of Law in Response to Questions Posed by the Court Regarding Proposed Settlement ("SEC Mem.") at 17.

In a parallel Complaint filed the same day against Citigroup employee Brian Stoker, see U.S. Securities and Exchange Commission v. Brian H. Stoker, 11 Civ. 7388 (JSR),[1] the S.E.C. alleged that Citigroup knew in advance that it would be difficult to sell the Fund if Citigroup disclosed its intention to use it as a vehicle to unload its hand-picked set of negatively projected assets, see Stoker Complaint ¶ 25. Specifically, paragraph 25 of the Stoker Complaint alleges (in language some of which is notably missing from the Citigroup Complaint) that:

> Citigroup knew it would be difficult to place the liabilities of [the Fund] if it disclosed to investors its intention to use the vehicle to short a hand-picked set of [poorly rated assets] .... By contrast, Citigroup knew that representing to investors that an experienced third-party investment adviser had selected the portfolio would facilitate the placement of the [Fund's] liabilities. (emphasis supplied)

Although this would appear to be tantamount to an allegation of knowing and fraudulent intent ("scienter," in the lingo of securities law), the S.E.C., for reasons of its own, chose to charge Citigroup

---

[1] Nothing in this Opinion and Order has any bearing on the case against Stoker, which is currently scheduled to commence trial on July 16, 2012.

only with negligence, in violation of Sections 17(a)(2) and (3) of the Securities Act, 15 U.S.C. § 77q(a)(2) and (3). Complaint ¶ 65.

Simultaneously with the filing of its Complaint against Citigroup, the S.E.C. presented to the Court for its signature a "Final Judgment As To Defendant Citigroup Global Markets Inc." (the "Consent Judgment"), together with a Consent of Defendant Citigroup Global Markets Inc. (the "Consent") that recited that Citigroup consented to the entry of the Consent Judgment "[w]ithout admitting or denying the allegations of the complaint ...." Consent ¶ 2. The Consent Judgment (I) "permanently restrained and enjoined" Citigroup and its agents, employees, etc., from future violations of Sections 17(a)(2) and (3) of the Securities Act, (II) required Citigroup to disgorge to the S.E.C. Citigroup's $160 million in profits, plus $30 million in interest thereon, and to pay to the S.E.C. a civil penalty in the amount of $95 million, and (III) required Citigroup to undertake for a period of three years, subject to enforcement by the Court, certain internal measures designed to prevent recurrences of the securities fraud here perpetrated.

Upon receipt of these submissions, the Court, by Order dated October 27, 2011, put some questions to the parties concerning the proposed Consent Judgment, to which the parties responded both in writing, see SEC Mem., supra, and Memorandum on Behalf of Citigroup Global Markets Inc. in Support of the Proposed Final Judgment and

3

Consent ("Citigroup Mem."), and orally, see transcript of oral argument, 11/9/11 ("Tr."). Since then, the Court has spent long hours trying to determine whether, in view of the substantial deference due the S.E.C. in matters of this kind, the Court can somehow approve this problematic Consent Judgment. In the end, the Court concludes that it cannot approve it, because the Court has not been provided with any proven or admitted facts upon which to exercise even a modest degree of independent judgment.

The Court turns first to the standard of review. In its original Memorandum in support of the proposed Consent Judgment, filed before the case had been assigned to any judge, the S.E.C. expressly endorsed the standard of review set forth by this Court in its Bank of America decisions, i.e., "whether the proposed Consent Judgment ... is fair, reasonable, adequate, and in the public interest." Memorandum By Plaintiff Securities and Exchange Commission in Support of Proposed Settlement at 5 (quoting with approval SEC v. Bank of America Corp., 653 F. Supp. 2d 507, 508 (S.D.N.Y. 2009)("Bank of America I")); see also SEC v. Bank of America Corp., 2010 WL 624581, at *6 (S.D.N.Y. Feb. 22, 2010)("Bank of America II"). This was also the S.E.C.'s stated position in another, intervening proceeding before this Court, SEC v. Vitesse Semiconductor Corp., 771 F. Supp. 2d 304 (S.D.N.Y. 2010).

In its most recent filing in this case, however, the S.E.C. partly reverses its previous position and asserts that, while the Consent Judgment must still be shown to be fair, adequate, and reasonable, "the public interest ... is not part of [the] applicable standard of judicial review." SEC Mem. at 4 n. 1. This is erroneous. A large part of what the S.E.C. requests, in this and most other such consent judgments, is injunctive relief, both broadly, in the request for an injunction forbidding future violations, and more narrowly, in the request that the Court enforce future prophylactic measures (here, for a three-year period). The Supreme Court has repeatedly made clear, however, that a court cannot grant the extraordinary remedy of injunctive relief without considering the public interest. See, e.g., eBay, Inc. v. MercExchange, 547 U.S. 388, 391 (2006)("According to well-established principles of equity, a plaintiff seeking a permanent injunction ... must demonstrate ... that the public interest would not be disserved by a permanent injunction."). Indeed, the Court has held that "'In exercising their discretion, courts ... should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'" Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 24 (2008) (quoting Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982)). Similarly, the Second Circuit has repeatedly stated, most recently in Salinger v. Colting, 607 F.3d 68, 80 (2d Cir. 2010), that

a court "must ensure that the public interests would not be disserved by the issuance" of an injunction. Id. at 80.

As a fall-back, the S.E.C. suggests that, if the public interest must be taken into account, the S.E.C. is the sole determiner of what is in the public interest in regard to Consent Judgments settling S.E.C. cases. See SEC Mem. at 4 n.1 (citing SEC v. Randolph, 736 F.2d 525, 529 (9th Cir. 1984). That, again, is not the law. Although in its somewhat delphic decision in Randolph the Ninth Circuit found that, on the facts of that case, there was no difference between the requirement of reasonableness and the requirement of being in the public interest, it was emphatic in upholding "the appropriateness of a requirement that the decree be in the public interest." Id. at 529. More pertinently, the D.C. Circuit, in United States v. Trucking Employers. Inc., 561 F.2d 313 (DC Cir. 1977), reaffirmed that "prior to approving a consent decree a court must satisfy itself of the settlement's 'overall fairness to beneficiaries and consistency with the public interest.'" Id. at 319  (quoting United States v. Allegheny Ludlum Industries, 517 F.2d 826, 850 (5th Cir. 1975)(emphasis supplied). As these and similar authorities make plain, a court, while giving substantial deference to the views of an administrative body vested with authority over a particular area, must still exercise a modicum of independent judgment in determining whether the requested deployment of its injunctive powers will serve,

or disserve, the public interest. Anything less would not only violate the constitutional doctrine of separation of powers but would undermine the independence that is the indispensable attribute of the federal judiciary.

As a practical matter, moreover, and as Randolph implies, the requirement that a consent judgment be in the public interest is not meaningfully severable from the requirements, still acknowledged by the S.E.C., that the consent judgment be fair, reasonable, and adequate; for all these requirements inform each other. For example, before the Court determines whether the proposed Consent Judgment is adequate, it must answer a preliminary question: adequate for what purpose? The answer, at least in part, is that the settlement must be adequate to ensure that the public interest is protected. See Randolph, 736 F.2d at 529 ("the SEC ought to always be required to serve the public interest"). The same analysis applies to the determination of the fairness of the settlement. Before the Court determines whether the settlement is fair, it must ask a preliminary question: fair to whom? As the holding of Trucking Employers quoted above makes plain, the answer is fair to the parties and to the public.

Without multiplying examples, it is clear that before a court may employ its injunctive and contempt powers in support of an administrative settlement, it is required, even after giving

substantial deference to the views of the administrative agency, to be satisfied that it is not being used as a tool to enforce an agreement that is unfair, unreasonable, inadequate, or in contravention of the public interest.

Applying these standards to the case in hand, the Court concludes, regretfully, that the proposed Consent Judgment is neither fair, nor reasonable, nor adequate, nor in the public interest. Most fundamentally, this is because it does not provide the Court with a sufficient evidentiary basis to know whether the requested relief is justified under any of these standards. Purely private parties can settle a case without ever agreeing on the facts, for all that is required is that a plaintiff dismiss his complaint.[2] But when a public agency asks a court to become its partner in enforcement by imposing wide-ranging injunctive remedies on a defendant, enforced by the formidable judicial power of contempt,[3] the court, and the public, need some knowledge of what the underlying facts are: for otherwise, the court becomes a mere handmaiden to a settlement privately negotiated on the basis of unknown facts, while the public

---

[2] When the private parties go further and ask a court to retain jurisdiction to enforce the settlement, a court has total discretion whether or not to do so, see generally Kokkonen v. Guardian Life Insurance Co., 511 U.S. 375, 381 (1994), and many judges in this District routinely decline to approve a stipulation of the parties that so provides.

[3] The Second Circuit has described the contempt power as "among the most formidable weapons in the court's arsenal." United States v. Local 1804-1, Int'l Longshoremen's Ass'n, AFL-CIO, 44 F.3d 1091, 1095 (2d Cir. 1995).

is deprived of ever knowing the truth in a matter of obvious public importance.

Here, the S.E.C.'s long-standing policy - hallowed by history, but not by reason - of allowing defendants to enter into Consent Judgments without admitting or denying the underlying allegations,[4] deprives the Court of even the most minimal assurance that the substantial injunctive relief it is being asked to impose has any basis in fact.  There is little real doubt that Citigroup contests the factual allegations of the Complaint.  In colloquy with the Court, counsel for Citigroup expressly reconfirmed that his client was not admitting the allegations of the Complaint, see tr. 13. He also noted, correctly, that he was free - notwithstanding the S.E.C.'s gag order precluding Citigroup from contesting the S.E.C.'s allegations in the media[5] - to fully contest the facts in any parallel litigation; and he strongly hinted that Citigroup would do just that. Tr. 26-27; see also Citibank Mem. at 7-8, 11.

The S.E.C., by contrast, took the position that, because Citigroup did not expressly deny the allegations, the Court, and the

---

[4] See Vitesse, 771 F. Supp. 2d at 308-10 (tracing the history of the policy).

[5] On its face, the SEC's no-denial policy raises a potential First Amendment problem.  See Vitesse, 771 F. Supp. 2d at 309 ("[H]ere an agency of the United States is saying, in effect, 'Although we claim that these defendants have done terrible things, they refuse to admit it and we do not propose to prove it, but will simply resort to gagging their right to deny it'"); see also Crosby v. Bradstreet Co., 312 F.2d 483, 485 (2d Cir. 1963) (reversing a consent settlement between two parties because the "injunction, enforceable through the contempt power, constitute[d] a prior restraint by the United States against the publication of facts which the community has a right to know").

public, somehow knew the truth of the allegations. Tr. 12-13. This is wrong as a matter of law and unpersuasive as a matter of fact. As a matter of law, an allegation that is neither admitted nor denied is simply that, an allegation. It has no evidentiary value and no collateral estoppel effect. It is precisely for this reason that the Second Circuit held long ago, in Lipsky v. Commonwealth United Corp., 551 F.2d 887 (2d Cir. 1976), that "a consent judgment between a federal agency and a private corporation which is not the result of an actual adjudication of any of the issues ... can not be used as evidence in subsequent litigation." Id. at 893. It follows that the allegations of the complaint that gives rise to the consent judgment are not evidence of anything either. Indeed the Lipsky court went so far as to hold that "neither [an S.E.C.] complaint nor reference to [such] a complaint which results in a consent judgment may properly be cited in the pleadings" in a parallel private action and must instead be stricken. Id.

As for common experience, a consent judgment that does not involve any admissions and that results in only very modest penalties is just as frequently viewed, particularly in the business community, as a cost of doing business imposed by having to maintain a working relationship with a regulatory agency, rather than as any indication of where the real truth lies. This, indeed, is Citigroup's position in this very case. See Citigroup Mem. at 6-8.

10

Of course, the policy of accepting settlements without any admissions serves various narrow interests <u>of the parties</u>. In this case, for example, Citigroup was able, without admitting anything, to negotiate a settlement that (a) charges it only with negligence, (b) results in a very modest penalty, (c) imposes the kind of injunctive relief that Citigroup (a recidivist) knew that the S.E.C. had not sought to enforce against any financial institution for at least the last 10 years, <u>see</u> SEC Mem. at 23, and (d) imposes relatively inexpensive prophylactic measures for the next three years. In exchange, Citigroup not only settles what it states was a broad-ranging four-year investigation by the S.E.C. of Citigroup's mortgage-backed securities offerings, Tr. 27, but also avoids any investors' relying in any respect on the S.E.C. Consent Judgment in seeking return of their losses. If the allegations of the Complaint are true, this is a very good deal for Citigroup; and, even if they are untrue, it is a mild and modest cost of doing business.

It is harder to discern from the limited information before the Court what the S.E.C. is getting from this settlement other than a quick headline. By the S.E.C.'s own account, Citigroup is a recidivist, SEC Mem. at 21, and yet, in terms of deterrence, the $95 million civil penalty that the Consent Judgment proposes is pocket change to any entity as large as Citigroup.[6] While the S.E.C. claims

---

[6] Although the S.E.C. asserts that the fact that it is only charging negligence limits the amount of money it can recover from Citigroup, either by way of civil

that it is devoted, not just to the protection of investors but also to helping them recover their losses, the proposed Consent Judgment, in the form submitted to the Court, does not commit the S.E.C. to returning any of the total of $285 million obtained from Citigroup to the defrauded investors but only suggests that the S.E.C. "may" do so. Consent Judgment at 3. In any event, this still leaves the defrauded investors substantially short-changed. To be sure, at oral argument, the S.E.C. reaffirmed its long-standing purported support for private civil actions designed to recoup investors' losses. Tr. 10. But in actuality, the combination of charging Citigroup only with negligence and then permitting Citigroup to settle without either admitting or denying the allegations deals a double blow to any assistance the defrauded investors might seek to derive from the S.E.C. litigation in attempting to recoup their losses through private litigation, since private investors not only cannot bring securities claims based on negligence, see, e.g., Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976), but also cannot derive any collateral estoppel assistance from Citigroup's non-admission/non-denial of the S.E.C.'s allegations. Nor, as noted, does the public,

---

penalty or by way of disgorgement, see SEC Mem. at 17, it acknowledges in a footnote that the Second Circuit has assumed that "equitable restitution" is available in any government enforcement action. SEC Mem. at 17 n.6 (citing F.T.C. v. Verity Int'l, Ltd., 443 F.3d 48, 66 (2d Cir. 2006)).

especially the business public, have any reason to credit those allegations, which remain entirely unproven.[7]

The point, however, is not that certain narrow interests of the parties might not be served by the Consent Judgment, but rather that the parties' successful resolution of their competing interests cannot be automatically equated with the public interest, especially in the absence of a factual base on which to assess whether the resolution was fair, adequate, and reasonable. Even after giving the fullest deference to the S.E.C.'s views – which have more than once

---

[7] The Court is also troubled when it compares the proposed Consent Judgment with the consent judgment entered last year between the SEC and Goldman Sachs ("Goldman"). See SEC v. Goldman Sachs & Co. et al., No. 10 Civ. 3229 (BSJ), Dkt. 25 ("Goldman Consent Judgment"). Goldman involved a similar but arguably less egregious factual scenario in that Goldman was charged with not disclosing that an outside hedge fund, Paulson & Co., had played a significant role in the portfolio selection process and had maintained a short position in the assets it had selected. See SEC v. Goldman Sachs & Co., supra, Dkt. 1 ("Goldman Complaint") ¶ 2. Nonetheless, the consent judgment in Goldman required Goldman to pay a $535 million penalty, even though it made only $15 million in profits. Goldman Consent Judgment ¶ 2. Here, as noted above, Citigroup made $160 million in profits and paid only a $95 million fine. The SEC argues that Goldman was charged with scienter-based violations, and that those violations make possible a more significant sanction. SEC Mem. at 19. This logic is circular, however, because the SEC does not explain how Goldman's actions were more culpable or scienter-based than Citigroup's actions here. Furthermore, the consent judgment in Goldman contained several terms that are notably missing from the proposed Consent Judgment here. First, the consent judgment included the following express admission from Goldman:

> "Goldman acknowledges that the marketing materials for the ABACUS 2007-AC1 transaction contained incomplete information. In particular, it was a mistake for the Goldman marketing materials to state that the reference portfolio was 'selected by' ACA Management LLC without disclosing the role of Paulson & Co. Inc. in the portfolio selection process and that Paulson's economic interests were adverse to [portfolio] investors. Goldman regrets that the marketing materials did not contain that disclosure."

(Goldman Consent Judgment ¶ 3.) Second, Goldman agreed to additional remedial measures beyond those agreed to by Citigroup in the instant case. Third, Goldman agreed to cooperate with the SEC in a number of ways, such as making its employees available for interviews by SEC staff and ordering its employees to testify "at trial and other judicial proceedings when requested by Commission staff." Id. ¶ 17. By contrast, Citigroup has not agreed to cooperate with the SEC in any cognizable respect. SEC Mem. 21.

13

persuaded this Court to approve an S.E.C. Consent Judgment it found dubious on the merits, see, e.g., Bank of America II, supra – the Court is forced to conclude that a proposed Consent Judgment that asks the Court to impose substantial injunctive relief, enforced by the Court's own contempt power, on the basis of allegations unsupported by any proven or acknowledged facts whatsoever, is neither reasonable, nor fair, nor adequate, nor in the public interest.

It is not reasonable, because how can it ever be reasonable to impose substantial relief on the basis of mere allegations? It is not fair, because, despite Citigroup's nominal consent, the potential for abuse in imposing penalties on the basis of facts that are neither proven nor acknowledged is patent. It is not adequate, because, in the absence of any facts, the Court lacks a framework for determining adequacy. And, most obviously, the proposed Consent Judgment does not serve the public interest, because it asks the Court to employ its power and assert its authority when it does not know the facts.

An application of judicial power that does not rest on facts is worse than mindless, it is inherently dangerous. The injunctive power of the judiciary is not a free-roving remedy to be invoked at the whim of a regulatory agency, even with the consent of the regulated. If its deployment does not rest on facts – cold, hard,

14

solid facts, established either by admissions or by trials - it serves no lawful or moral purpose and is simply an engine of oppression.

Finally, in any case like this that touches on the transparency of financial markets whose gyrations have so depressed our economy and debilitated our lives, there is an overriding public interest in knowing the truth. In much of the world, propaganda reigns, and truth is confined to secretive, fearful whispers. Even in our nation, apologists for suppressing or obscuring the truth may always be found. But the S.E.C., of all agencies, has a duty, inherent in its statutory mission, to see that the truth emerges; and if it fails to do so, this Court must not, in the name of deference or convenience, grant judicial enforcement to the agency's contrivances.

Accordingly, the Court refuses to approve the proposed Consent Judgment. Instead, the Court hereby consolidates this case with the Stoker action, adopts the Case Management Order in that action as equally applicable to the instant case, and directs the parties to be ready to try this case on July 16, 2012.

SO ORDERED.

Dated: New York, NY
November 28, 2011

_____
JED S. RAKOFF, U.S.D.J.