**MANDATE**

# UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

1:11-cv-07387-JSR

_____

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 4th day of June, two thousand and fourteen.

Before:    Rosemary S. Pooler,
           Raymond J. Lohier, Jr.,
           Susan L. Carney,
           *Circuit Judges*.

_____

United States Securities and Exchange Commission,

   Plaintiff - Appellant - Cross - Appellee,

v.

Citigroup Global Markets, Inc.,

   Defendant - Appellee - Cross - Appellant.

_____

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: July 28, 2014

**JUDGMENT**
Docket No. 11-5227(L)
                11-5375(con)
                11-5242(xap)

The appeal in the above captioned case from an order of the United States District Court for the Southern District of New York was argued on the district court record and the parties' briefs.  Upon consideration thereof,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the order of the district court is VACATED and the case is REMANDED for further proceedings in accordance with the opinion of this court.  Because the Court exercised jurisdiction pursuant to 28 U.S.C. § 1292(a)(1), the petition for a writ of mandamus is DENIED as moot.

For The Court:

Catherine O'Hagan Wolfe,
Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

**MANDATE ISSUED ON 07/28/2014**

11-5227-cv(L)
United States Securities and Exchange Commission v. Citigroup Global Markets, Inc.

1      UNITED STATES COURT OF APPEALS
2           FOR THE SECOND CIRCUIT

3             _____

4

5              August Term, 2012

6

7      (Argued: February 8, 2013        Decided: June 4, 2014)

8

9       Docket Nos.  11-5227-cv (L); 11-5375-cv(con), 11-5242-cv(xap)

10

11            _____

12

13  UNITED STATES SECURITIES AND EXCHANGE COMMISSION,
14            *Plaintiff-Appellant-Cross-Appellee*,

15

16                    v.

17

18  CITIGROUP GLOBAL MARKETS, INC.,

19

20            *Defendant-Appellee-Cross-Appellant*.

21

22            _____

23

24  Before: POOLER, LOHIER, and CARNEY, *Circuit Judges*.

25

26      The United States Securities and Exchange Commission ("S.E.C.") appeals

27  from the November 28, 2011 order of the United States District Court for the

28  Southern District of New York (Jed S. Rakoff, *J.*) refusing to approve a settlement

29  between the S.E.C. and Citigroup Global Markets Inc. and setting a trial date.

30  Our Court stayed the order on March 15, 2012.  *S.E.C. v. Citigroup Global Mkts.*,

1    *Inc.*, 673 F.3d 158 (2d Cir. 2012).  We find the district court abused its discretion

2    by applying an incorrect legal standard in its review, and vacate and remand for

3    further proceedings consistent with this opinion.

4    Vacated and remanded.

5    _____

6                    MICHAEL A. CONLEY, Deputy General Counsel,
7                    Securities and Exchange Commission (Jacob H.
8                    Stillman, Solicitor, Mark Pennington, Assistant General
9                    Counsel, Jeffrey A. Berger, Senior Counsel, *on the brief*),
10                   Washington, D.C., *for Plaintiff-Appellant-Cross-Appellee*
11                   *United States Securities and Exchange Commission.*
12
13                   BRAD S. KARP, Paul, Weiss, Rifkind, Wharton &
14                   Garrison, LLP (Theodore V. Wells, Jr., Mark F.
15                   Pomerantz, Walter Rieman, Susanna M. Buergel, *on the*
16                   *brief*), New York, N.Y., *for Defendant-Appellee-Cross-*
17                   *Appellant Citigroup Global Markets, Inc.*
18
19                   JOHN R. WING, Lankler Siffert & Wohl LLP (Patrick P.
20                   Garlinger, *on the brief*), New York, N.Y., *Appointed Pro*
21                   *Bono Counsel for the United States District Court for the*
22                   *Southern District of New York (Jed S. Rakoff, J.).*
23
24                   MARK A. PERRY, Gibson, Dunn & Crutcher, LLP,
25                   Washington, D.C., *for Amicus Curiae Business Roundtable,*
26                   *in support of reversal.*
27
28                   WILLIAM MICHAEL CUNNINGHAM, Temple Hills,
29                   MD, *Amicus Curiae pro se, in support of affirmance.*
30

2

1      DENNIS M. KELLEHER (Stephen W. Hall, Katelynn O.

2      Bradley, *on the brief*) Washington, D.C., *for Amicus Curiae*

3      *Better Markets, Inc., in support of the affirmance.*

4

5      MATTHEW G. YEAGER, PH.D., Department of

6      Sociology, King's University College, London, Ontario

7      (William Calathes, Department of Criminal Justice, New

8      Jersey City University, Jersey City, N.J., *on the brief*),

9      *Amici Curiae pro se, in support of affirmance.*

10

11      BARBARA J. BLACK, Charles Hartsock Professor of

12      Law & Director, Corporate Law Center, University of

13      Cincinnati College of Law, Cincinnati, Ohio, *for Amici*

14      *Curiae Securities Law Scholars Jayne W. Barnard, Douglas*

15      *M. Branson, Chris J. Brummer, Samuel W. Buell, John C.*

16      *Coffee, Jr., James D. Cox, James Fanto, Jill E. Fisch, Tamar*

17      *Frankel, Theresa Gabaldon, Joan MacLeod Heminway,*

18      *Thomas W. Joo, Lawrence E. Mitchell, Jennifer O'Hare, Alan*

19      *R. Palmiter, Margaret V. Sachs, Faith Stevelman, and Lynn*

20      *A. Stout, in support of affirmance.*

21

22      AKSHAT TEWARY, Edison, N.J., *for Amicus Curiae*

23      *Occupy Wall Street - Alternative Banking Group, in support*

24      *of affirmance.*

25

26      TERESA MARIE GOODY, Kalorama Legal Services,

27      PLLC, Washington, D.C., *for Amicus Curiae Harvey L.*

28      *Pitt, in support of affirmance.*

29

30      LORI ALVINO MCGILL, Latham & Watkins LLP,

31      (Robin S. Conrad, Rachel Brand, National Chamber

32      Litigation Center, Inc.; James M. Spears, Melissa B.

33      Kimmel, Pharmaceutical Research and Manufacturers of

34      America, *on the brief*), Washington, D.C., *for Amici Curiae*

35      *Chamber of Commerce of the United States and*

3

1      *Pharmaceutical Research and Manufacturers of America, in*
2      *support of reversal.*
3
4      ANNETTE L. NAZARETH, Davis Polk & Wardwell
5      LLP (Edmund Polubinski III, Gina Caruso, *on the brief*)
6      New York, N.Y., *for Amicus Curiae Securities Industry and*
7      *Financial Markets Association, in support of reversal.*
8
9      DANIEL P. CHIPLOCK, Lieff Cabraser Heimann &
10     Bernstein, LLP, New York, N.Y., *for Amicus Curiae*
11     *National Association of Shareholder and Consumer*
12     *Attorneys, in support of reversal.*
13
14   POOLER, *Circuit Judge*:

15        The United States Securities and Exchange Commission ("S.E.C.") in

16   conjunction with Citigroup Global Markets, Inc. ("Citigroup") appeals from the

17   November 28, 2011 order of the United States District Court for the Southern

18   District of New York (Rakoff, *J.*) refusing to approve a consent decree entered

19   into by the parties and instead setting a trial date. Our Court stayed that order

20   and referred the matter to a merits panel for consideration of the underlying

21   questions. *S.E.C. v. Citigroup Global Markets, Inc.*, 673 F.3d 158 (2d Cir. 2012). We

22   now hold that the district court abused its discretion by applying an incorrect

23   legal standard in assessing the consent decree and setting a date for trial.

24

4

# BACKGROUND

## I.     Complaint and proposed consent judgment.

In October 2011, the S.E.C. filed a complaint against Citigroup, alleging that Citigroup  negligently misrepresented its role and economic interest in structuring and marketing a billion-dollar fund, known as the Class V Funding III ("the Fund"), and violated Sections 17(a)(2) and (3) of the Securities Act of 1933 ( the "Act").  The complaint alleges that Citigroup "exercised significant influence" over the selection of $500 million worth of the Fund's assets, which were primarily collateralized by subprime securities tied to the already faltering U.S. housing market.  Citigroup told Fund investors that the Fund's investment portfolio was chosen by an independent investment advisor, but, the S.E.C. alleged, Citigroup itself selected a substantial amount of negatively projected mortgage-backed assets in which Citigroup had taken a short position.  By assuming a short position, Citigroup realized profits of roughly $160 million from the poor performance of its chosen assets, while Fund investors suffered millions of dollars in losses.

Shortly after filing of the complaint,  the S.E.C. filed a  proposed consent judgment.  In the proposed consent judgment, Citigroup agreed to: (1) a

5

1    permanent injunction barring Citigroup from violating Act Sections 17(a)(2) and

2    (3); (2) disgorgement of $160 million, which the S.E.C. asserted were Citigroup's

3    net profits gained as a result of the conduct alleged in the complaint; (3)

4    prejudgment interest in the amount of $30 million; and (4) a civil penalty of $95

5    million.  Citigroup also agreed not to seek an offset against any compensatory

6    damages awarded in any related investor action.  Citigroup consented to make

7    internal changes, for a period of three years, to prevent similar acts from

8    happening in the future.  Absent from the consent decree was any admission of

9    guilt or liability.

10          The S.E.C. also filed a parallel complaint against Citigroup employee Brian

11   Stoker.  *See S.E.C. v. Brian H. Stoker*, 11 Civ. 7388 (JSR).  The *Stoker* complaint

12   alleged that Stoker negligently violated Sections 17(a)(2) and (3) of the Act in

13   connection with his role in structuring and marketing the collateralized debt

14   obligations in the Fund.

15   **II.    Proceedings before the district court**.

16          The district court scheduled a hearing in the matter, and presented the

17   S.E.C. and Citigroup with a list of questions to answer.  The questions included:

18          •     Why should the Court impose a judgment in a case in which the

6

1    S.E.C. alleges a serious securities fraud but the defendant neither

2    admits nor denies wrongdoing?

3    • Given the S.E.C.'s statutory mandate to ensure transparency in the

4    financial marketplace, is there an overriding public interest in

5    determining whether the S.E.C.'s charges are true?  Is the interest

6    even stronger when there is no parallel criminal case?

7    • How was the amount of the proposed judgment determined?  In

8    particular, what calculations went into the determination of the $95

9    million penalty?  Why, for example, is the penalty in this case less

10    than one-fifth of the $535 million penalty assessed in *S.E.C. v.*

11    *Goldman Sachs & Co.* . . . ?  What reason is there to believe this

12    proposed penalty will have a meaningful deterrent effect?

13    • The proposed judgment imposes injunctive relief against future

14    violations.  What does the S.E.C. do to maintain compliance?  How

15    many contempt proceedings against large financial entities has the

16    S.E.C. brought in the past decade as a result of violations of prior

17    consent judgments?

18    • Why is the penalty in this case to be paid in large part by Citigroup

19    and its shareholders rather than by the "culpable individual

7

1     offenders acting for the corporation?" [] If the S.E.C. was for the

2     most part unable to identify such alleged offenders, why was this?

3   •  How can a securities fraud of this nature and magnitude be the

4     result simply of negligence?

5   Both the S.E.C. and Citigroup submitted written responses to the district

6 court's questions.  On November 9, 2011, the district court conducted a hearing to

7 explore the questions presented.  A few weeks later, the district court issued a

8 written opinion declining to approve the consent judgment.  *S.E.C. v. Citigroup*

9 *Global Markets Inc.*, 827 F. Supp. 2d 328 (S.D.N.Y. 2011) ("*Citigroup I*").  The

10 district court stated that

11    before a court may employ its injunctive and contempt
12    powers in support of an administrative settlement, it is
13    required, even after giving substantial deference to the
14    views of the administrative agency, to be satisfied that it
15    is not being used as a tool to enforce an agreement that
16    is unfair, unreasonable, inadequate, or in contravention
17    of the public interest.
18
19 *Id.* at 332.  It found that the proposed consent decree

20    is neither fair, nor reasonable, nor adequate, nor in the
21    public interest . . . because it does not provide the Court
22    with a sufficient evidentiary basis to know whether the
23    requested relief is justified under any of these
24    standards.  Purely private parties can settle a case

1        without ever agreeing on the facts, for all that is

2        required is that a plaintiff dismiss his complaint.  But

3        when a public agency asks a court to become its partner

4        in enforcement by imposing wide-ranging injunctive

5        remedies on a defendant, enforced by the formidable

6        judicial power of contempt, the court, and the public,

7        need some knowledge of what the underlying facts are:

8        for otherwise, the court becomes a mere handmaiden to

9        a settlement privately negotiated on the basis of

10        unknown facts, while the public is deprived of ever

11        knowing the truth in a matter of obvious public

12        importance.

13

14  *Id.* (footnotes omitted).

15        The district court criticized the relief obtained by the S.E.C. in the consent

16  decree, comparing it unfavorably with settlements entered in *S.E.C. v. Bank of*

17  *America Corp.*, No. 09 Civ. 6829(JSR), 2010 WL 624581 (S.D.N.Y. Feb. 22, 2010),

18  and in *S.E.C. v. Goldman Sachs & Co. et al.*, No. 10 Civ. 3229 (BSJ), Docket No. 25

19  (S.D.N.Y. July 20, 2010).  *See Citigroup I*, 827 F. Supp. 2d at 330-31, 334 n.7.  In both

20  *Bank of America* and *Goldman Sachs*, the district court noted, the parties stipulated

21  to certain findings of facts.  Without such an evidentiary basis in this case, the

22  district court reasoned, "the Court is forced to conclude that a proposed Consent

23  Judgment that asks the Court to impose substantial injunctive relief, enforced by

24  the Court's own contempt power, on the basis of allegations unsupported by any

1    proven or acknowledged facts whatsoever, is neither reasonable, nor fair, nor

2    adequate, nor in the public interest." *Id.* at 335.

3    Thus, the district court concluded:

4            An application of judicial power that does not rest on
5            facts is worse than mindless, it is inherently dangerous.
6            The injunctive power of the judiciary is not a free-roving
7            remedy to be invoked at the whim of a regulatory
8            agency, even with the consent of the regulated. If its
9            deployment does not rest on facts—cold, hard, solid
10           facts, established either by admissions or by trials—it
11           serves no lawful or moral purpose and is simply an
12           engine of oppression.
13
14   *Id.*

15           The district court refused to approve the consent judgment, and instead

16   consolidated this case with the *Stoker* action and ordered the parties to be

17   prepared to try both cases on July 16, 2012.

18   **III.    Prior proceedings before this Court.**

19           The S.E.C. and Citigroup filed immediate notices of appeal.  The S.E.C. also

20   moved in the district court for an emergency stay pending the outcome of the

21   appeal, but before the district court could decide the stay motion before it, the

22   S.E.C. sought  an emergency stay in our Court.  As an alternative basis for relief,

23   the S.E.C. also filed a petition for a writ of mandamus to set the order aside.

10

1    Prior to our Court's ruling on the stay motion and mandamus petition, the

2    district court issued its decision denying the motion for a stay. *S.E.C. v. Citigroup*

3    *Global Markets Inc.*, 827 F. Supp. 2d 336 (S.D.N.Y. 2011) ("*Citigroup II*"). The

4    district court reasoned that our Court lacked jurisdiction to hear an interlocutory

5    appeal from the denial of approval of a consent judgment. *Id.* at 338-39. As to

6    the S.E.C.'s proposal to file a writ of mandamus as an alternative to a statutory

7    appeal, the district court similarly found that such action would not divest it of

8    jurisdiction, and, consequently, declined to consider the S.E.C.'s request for a

9    stay. *Id.* at 339-40.

10    Our Court disagreed, granting the motion for a stay pending before us.

11    *S.E.C. v. Citigroup Global Markets Inc.*, 673 F.3d 158 (2d Cir. 2012) ("*Citigroup III*").

12    We concluded that the S.E.C. demonstrated a strong likelihood of success on the

13    merits, because the district court did not accord the S.E.C.'s judgment adequate

14    deference. *Id.* at 163-65. As both parties before us advocated for approving the

15    consent order, we ordered counsel appointed to advocate for the district court's

16    order. *Id.* at 169. Before us now is the merits appeal.

17

18

11

# ANALYSIS

We review the district court's denial of a settlement agreement under an abuse of discretion standard. *See S.E.C. v. Wang*, 944 F.2d 80, 85 (2d Cir. 1991). A district court abuses its discretion if it "(1) based its ruling on an erroneous view of the law," (2) made a "clearly erroneous assessment of the evidence," or (3) "rendered a decision that cannot be located within the range of permissible decisions." *Lynch v. City of New York*, 589 F.3d 94, 99 (2d Cir. 2009) (internal quotation marks omitted).

## I.    Appellate jurisdiction.

The S.E.C. argues that we have jurisdiction to consider this interlocutory appeal pursuant to 28 U.S.C. § 1292(a)(1). We agree. Section 1292(a)(1) states in relevant part:

> (a) [T]he courts of appeals shall have jurisdiction of appeals from:
> (1) Interlocutory orders of the district courts of the United States, . . . or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions. . . .

"Because § 1292(a)(1) was intended to carve out only a limited exception to the final-judgment rule, we have construed the statute narrowly to ensure that

1    appeal as of right under § 1292(a)(1) will be available only in circumstances

2    where an appeal will further the statutory purpose of permitting litigants to

3    effectually challenge interlocutory orders of serious, perhaps irreparable,

4    consequence." *Carson v. Am. Brands Inc.*, 450 U.S. 79, 84 (1981) (internal quotation

5    marks omitted).   Thus, "[u]nless a litigant can show that an interlocutory order

6    of the district court might have a serious, perhaps irreparable, consequence, and

7    that the order can be effectually challenged only by immediate appeal, the

8    general congressional policy against piecemeal review will preclude

9    interlocutory appeal."  *Id.* (internal quotation marks omitted).

10        In *Carson,* the consent decree at issue permanently enjoined an employer

11    and a union from discriminating against African-American employees, required

12    changes to the way seniority and benefits were awarded, established hiring goals,

13    and granted job bidding preferences.  450 U.S. at 84.  The *Carson* court found the

14    district court's refusal to approve the consent decree constituted irreparable harm

15    because:

16            the District Court made clear that it would not enter any
17            decree containing remedial relief provisions that did not
18            rest solidly on evidence of discrimination and that were
19            not expressly limited to actual victims of discrimination.
20            In ruling so broadly, the court did more than postpone

13

1                consideration of the merits of petitioners' injunctive
2                claim. It effectively foreclosed such consideration.
3                Having stated that it could perceive no vestiges of racial
4                discrimination on the facts presented, and that even if it
5                could, no relief could be granted to future employees
6                and others who were not actual victims of
7                discrimination, the court made clear that nothing short
8                of an admission of discrimination by respondents plus a
9                complete restructuring of the class relief would induce it
10               to approve remedial injunctive provisions.

11 *Id.* at 87 n.12 (internal quotation marks omitted).  Moreover, the *Carson* court

12 found that "[b]ecause a party to a pending settlement might be legally justified in

13 withdrawing its consent to the agreement once trial is held and final judgment

14 entered, the District Court's order might thus have the 'serious, perhaps

15 irreparable, consequence' of denying the parties their right to compromise their

16 dispute on mutually agreeable terms." *Id.* at 87–88 (footnote omitted).  Finally, by

17 delaying approval of the consent decree, the plaintiffs were losing access to the

18 "specific job opportunities and the training and competitive advantages that

19 would come with those opportunities." *Id.* at 89 n.16.

20       In *New York v. Dairylea Cooperative, Inc.*, the parties entered into a

21 settlement to resolve a civil antitrust action.  698 F.2d 567, 568-69 (2d Cir. 1983).

22 The settlement included a provision labeled "Injunction" that:

14

would enjoin Dairylea from participating in any
agreement to fix the price of milk or allocate customers
during the next six years. . . . Dairylea [also] agreed to
allow New York access to its books, records and
personnel and to publicize, among its employees, the
terms of the arrangement for the purpose of ensuring
Dairylea's compliance with the decree's provisions.

*Id.* at 569.  We found that the proposed injunction did not meet the requirements

of *Carson* because the settlement agreement proposed minimal injunctive relief:

defendants were enjoined from violating the law.  *Id.* at 570.  The parties argued

that "because the proposed settlement would enjoin Dairylea from participating

in any conspiracy to fix prices or allocate customers," the "order disapproving

the settlement is in effect the denial of an injunction." *Id.*  We disagreed:

Taken to its extreme [] this argument would render the
disapproval of every proposed settlement appealable. It
would be a simple matter for the settling parties to
include in the agreement an injunctive provision
forbidding one party from violating the law. The mere
existence of an injunctive clause, therefore, cannot be
sufficient to render the disapproval of a proposed
settlement agreement appealable.

*Id.*

Thus, to bring an interlocutory appeal from a district court's denial of

settlement approval, a party must demonstrate "that (1) the district court, by

15

1    refusing to approve a settlement, effectively denied a party injunctive relief and

2    (2) in the absence of an interlocutory appeal, a party will suffer irreparable

3    harm." *Grant v. Local 638,* 373 F.3d 104, 108 (2d Cir. 2004).  That standard is

4    satisfied here.  The rejected consent decree provided for two types of injunctive

5    relief: (1) enjoining Citigroup from violating provisions of the Act in the future,

6    and (2) requiring Citigroup to undertake steps aimed at preventing future

7    occurrences of securities fraud, and periodically demonstrate compliance to the

8    S.E.C..  The S.E.C. also demonstrated irreparable harm: unlike the court in

9    *Dairylea*, here the district court expressed no willingness to revisit the settlement

10   agreement with the parties, instead setting a trial date.  *See, e.g., Grant*, 373 F.3d at

11   111 ("It bears repeating that the *Carson* court relied heavily on the district court's

12   warning that it would never approve a settlement similar to the one the parties

13   made." (citing *Carson*, 450 U.S. at 87 n.12)).  We are satisfied that our Court may

14   exercise jurisdiction over this interlocutory appeal.

15   **II.      The scope of the consent decree.**

16

17        We quickly dispense with the argument that the district court abused its

18   discretion by requiring Citigroup to admit liability as a condition for approving

19   the consent decree.  In both the briefing and at oral argument, the district court's

16

1   *pro bono* counsel stated that the district court did not seek an admission of

2   liability before approving the consent decree.   With good reason–there is no

3   basis in the law for the district court to require an admission of liability as a

4   condition for approving a settlement between the parties.  The decision to require

5   an admission of liability before entering into a consent decree rests squarely with

6   the S.E.C..  As the district court did not condition its approval of the consent

7   decree on an admission of liability, we need not address the issue further.

8   **III.    The scope of deference.**

9          We turn, then, to the far thornier question of what deference the district

10   court owes an agency seeking a consent decree.  Our Court recognizes a "strong

11   federal policy favoring the approval and enforcement of consent decrees."

12   *Wang*, 944 F.2d at 85.  "To be sure, when the district judge is presented with a

13   proposed consent judgment, he is not merely a 'rubber stamp.'" *S.E.C. v. Levine*,

14   881 F.2d 1165, 1181 (2d Cir. 1989).  The district court here found it was "required,

15   even after giving substantial deference to the views of the administrative agency,

16   to be satisfied that it is not being used as a tool to enforce an agreement that is

17   unfair, unreasonable, inadequate, or in contravention of the public interest."

18   *Citigroup I*, 827 F. Supp. 2d at 332.  Other district courts in our Circuit view "[t]he

17

1    role of the Court in reviewing and approving proposed consent judgments in

2    S.E.C. enforcement actions [as] 'restricted to assessing whether the settlement is

3    fair, reasonable and adequate within the limitations Congress has imposed on the

4    S.E.C. to recover investor losses.'" *S.E.C. v. CR Intrinsic Investors, LLC*, 939 F.

5    Supp. 2d 431, 434 (S.D.N.Y. 2013) (quoting *S.E.C. v. Cioffi*, 868 F. Supp. 2d 65, 74

6    (E.D.N.Y. 2012)); *see also United States v. Peterson*, 859 F. Supp. 2d 477, 478

7    (E.D.N.Y. 2012) ("A  district court has the duty to determine whether a consent

8    decree based on a proposed settlement is 'fair and reasonable.'").

9         The "fair, reasonable, adequate and in the public interest" standard

10   invoked by the district court finds its origins in a variety of cases.  Our Court

11   previously held, in the context of assessing a plan for distributing the proceeds of

12   a proposed disgorgement order, that "once the district court satisfies itself that

13   the distribution of proceeds in a proposed S.E.C. disgorgement plan is fair and

14   reasonable, its review is at an end." *Wang*, 944 F.2d at 85.  The Ninth Circuit— in

15   circumstances similar to those presented here, a proposed consent decree aimed

16   at settling an S.E.C. enforcement action—noted that "[u]nless a consent decree is

17   unfair, inadequate, or unreasonable, it ought to be approved."  *S.E.C. v. Randolph*,

18   736 F.2d 525, 529 (9th Cir. 1984).

18

1        Today we clarify that the proper standard for reviewing a proposed

2    consent judgment involving an enforcement agency requires that the district

3    court determine whether the proposed consent decree is fair and reasonable, with

4    the additional requirement that the "public interest would not be disserved,"

5    *eBay, Inc. v. MercExchange*, 547 U.S. 388, 391 (2006), in the event that the consent

6    decree includes injunctive relief.  Absent a substantial basis in the record for

7    concluding that the proposed consent decree does not meet these requirements,

8    the district court is required to enter the order.

9        We omit "adequacy" from the standard.  Scrutinizing a proposed  consent

10    decree for "adequacy" appears borrowed from the review applied to class action

11    settlements, and strikes us as particularly inapt in the context of a proposed

12    S.E.C. consent decree.  *See* Fed. R. Civ. P. 23(e)(2) ("If the proposal would bind the

13    class members, the court may approve it only after a hearing and on a finding

14    that it is fair, reasonable, and adequate.").  The adequacy requirement makes

15    perfect sense in the context of a class action settlement—a class action settlement

16    typically precludes future claims, and a court is rightly concerned that the

17    settlement achieved be adequate.  By the same token, a consent decree does not

18    pose the same concerns regarding adequacy—if there are potential plaintiffs with

19

1    a private right of action, those plaintiffs are free to bring their own actions.  If

2    there is no private right of action, then the S.E.C. is the entity charged with

3    representing the victims, and is politically liable if it fails to adequately perform

4    its duties.

5           A court evaluating a proposed S.E.C. consent decree for fairness and

6    reasonableness should, at a minimum, assess (1) the basic legality of the decree,

7    *see Benjamin v. Jacobson*, 172 F.3d 144, 155-59 (2d Cir. 1999) (terminating existing

8    consent decrees as required by the Prison Litigation Reform Act); (2) whether the

9    terms of the decree, including its enforcement mechanism, are clear, *see, e.g.,*

10   *Angela R. ex rel. Hesselbein v. Clinton*, 999 F.2d 320, 325 (8th Cir. 1993) (district

11   court abused its discretion by approving consent decree that did not properly

12   define the enforcement mechanisms);  (3) whether the consent decree reflects a

13   resolution of the actual claims in the complaint; and (4) whether the consent

14   decree is tainted by improper collusion or corruption of some kind.  *Cf. Kozlowski*

15   *v. Coughlin*, 871 F.2d 241, 244 (2d Cir. 1989) ("Before entering a consent judgment,

16   the district court must be certain that the decree 1) springs from and serves to

17   resolve a dispute within the court's subject-matter jurisdiction, 2) comes within

18   the general scope of the case made by the pleadings, and 3) furthers the objectives

20

1    of the law upon which the complaint was based." (internal quotation marks and

2    alternations omitted)). Consent decrees vary, and depending on the decree a

3    district court may need to make additional inquiry to ensure that the consent

4    decree is fair and reasonable. The primary focus of the inquiry, however, should

5    be on ensuring the consent decree is procedurally proper, using objective

6    measures similar to the factors set out above, taking care not to infringe on the

7    S.E.C.'s discretionary authority to settle on a particular set of terms.

8            It is an abuse of discretion to require, as the district court did here, that the

9    S.E.C. establish the "truth" of the allegations against a settling party as a

10   condition for approving the consent decrees. *Citigroup I*, 827 F. Supp. 2d at 332-

11   33. Trials are primarily about the truth. Consent decrees are primarily about

12   pragmatism. "[C]onsent decrees are normally compromises in which the parties

13   give up something they might have won in litigation and waive their rights to

14   litigation." *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 235 (1975).

15   Thus, a consent decree "must be construed as . . . written, and not as it might

16   have been written had the plaintiff established his factual claims and legal

17   theories in litigation." *United States v. Armour & Co.*, 402 U.S. 673, 682 (2d Cir.

18   1971). Consent decrees provide parties with a means to manage risk. "The

21

1  numerous factors that affect a litigant's decision whether to compromise a case or

2  litigate it to the end include the value of the particular proposed compromise, the

3  perceived likelihood of obtaining a still better settlement, the prospects of coming

4  out better, or worse, after a full trial, and the resources that would need to be

5  expended in the attempt." *Citigroup III*, 673 F.3d at 164; *see also Randolph*, 736 F.2d

6  at 529 ("Compromise is the essence of settlement. Even if the Commission's case

7  against [defendants] is strong, proceeding to trial would still be costly. The

8  S.E.C.'s resources are limited, and that is why it often uses consent decrees as a

9  means of enforcement." (citation omitted)). These assessments are uniquely for

10  the litigants to make. It is not within the district court's purview to demand

11  "cold, hard, solid facts, established either by admissions or by trials," *Citigroup I*,

12  827 F. Supp. 2d at 335, as to the truth of the allegations in the complaint as a

13  condition for approving a consent decree.

14      As part of its review, the district court will necessarily establish that a

15  factual basis exists for the proposed decree. In many cases, setting out the

16  colorable claims, supported by factual averments by the S.E.C., neither admitted

17  nor denied by the wrongdoer, will suffice to allow the district court to conduct its

18  review. Other cases may require more of a showing, for example, if the district

22

1    court's initial review of the record raises a suspicion that the consent decree was

2    entered into as a result of improper collusion between the S.E.C. and the settling

3    party.  We need not, and do not, delineate the precise contours of the factual basis

4    required to obtain approval for each consent decree that may pass before the

5    court.  It is enough to state that the district court here, with the benefit of copious

6    submissions by the parties, likely had a sufficient record before it on which to

7    determine if the proposed decree was fair and reasonable.   On remand, if the

8    district court finds it necessary, it may ask the S.E.C. and Citigroup to provide

9    additional information sufficient to allay any concerns the district court may have

10   regarding  improper collusion between the parties.

11           As noted earlier, when a proposed consent decree contains injunctive

12   relief, a district court must also consider the public interest in deciding whether

13   to grant the injunction.  *See eBay*, 547 U.S. at 391; *Salinger v. Colting*, 607 F.3d 68, 80

14   (2d Cir. 2010).  *eBay* makes clear that

15           a plaintiff seeking a permanent injunction must satisfy a
16           four-factor test before a court may grant such relief. A
17           plaintiff must demonstrate: (1) that it has suffered an
18           irreparable injury; (2) that remedies available at law,
19           such as monetary damages, are inadequate to
20           compensate for that injury; (3) that, considering the
21           balance of hardships between the plaintiff and

23

1    defendant, a remedy in equity is warranted; and (4) that
2    the public interest would not be disserved by a
3    permanent injunction.
4
5    547 U.S. at 391.  "*eBay* strongly indicates that the traditional principles of equity it

6    employed are the presumptive standard for injunctions in any context," be they

7    preliminary or permanent.  *Salinger,* 607 F.3d at 78; *see also World Wide Polymers,*

8    *Inc. v. Shinkong Synthetic Fibers Corp.*, 694 F.3d 155, 160-61 (2d Cir. 2012) (applying

9    the *eBay* test to a permanent injunction sought to remedy a breach of an exclusive

10   distributorship agreement).

11        Our analysis focuses on the issue reached by the district court: that the

12   district court must assure itself the "public interest would not be disserved" by

13   the issuance of a permanent injunction.  *eBay*, 547 U.S. at 391; *cf. WPIX, Inc. v. ivi,*

14   *Inc.*, 691 F.3d 275, 278 (2d Cir. 2012) (describing the test as "non-disservice of the

15   public interest by issuance of a preliminary injunction.")[1]

16        The job of determining whether the proposed S.E.C. consent decree best

17   serves the public interest, however, rests squarely with the S.E.C., and its

---

[1] The district court did not address, and the parties do not brief, whether
the remaining *eBay* factors were satisfied here.  We therefore do not address this
issue, except to note that the proposed consent decree waived Citigroup's right to
challenge any enforcement action on the ground that the consent decree fails to
conform to the requirements of Rule 65 of the Federal Rules of Civil Procedure.

24

decision merits significant deference:

> [F]ederal judges—who have no constituency—have a
> duty to respect legitimate policy choices made by those
> who do. The responsibilities for assessing the wisdom of
> such policy choices and resolving the struggle between
> competing views of the public interest are not judicial
> ones:  "Our Constitution vests such responsibilities in
> the public branches."

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 866 (1984)

(quoting *TVA v. Hill*, 437 U.S. 153, 195 (1978)); *see also In re Cuyahoga Equip. Corp.*,

980 F.2d 110, 118 (2d Cir. 1992) ("Appellate courts ordinarily defer to the agency's

expertise and the voluntary agreement of the parties in proposing the

settlement.").

The district court correctly recognized that it was required to consider the

public interest in deciding whether to grant the injunctive relief in the proposed

injunction.  *Citigroup I*, 827 F. Supp. 2d at 331.  However, the district court made

no findings that the injunctive relief proposed in the consent decree would

disserve the public interest, in part because it defined the public interest as "an

overriding interest in knowing the truth."  *Id.* at 335.  The district court's failure

to make the proper inquiry constitutes legal error.  On remand, the district court

should consider whether the public interest would be disserved by entry of the

25

1    consent decree.  For example, a consent decree may disserve the public interest if

2    it barred private litigants from pursuing their own claims independent of the

3    relief obtained under the consent decree.  What the district court may not do is

4    find the public interest disserved based on its disagreement with the S.E.C.'s

5    decisions on discretionary matters of policy, such as deciding to settle without

6    requiring an admission of liability.

7           To the extent the district court withheld approval of the consent decree on

8    the ground that it believed the S.E.C. failed to bring the proper charges against

9    Citigroup, that constituted an abuse of discretion.  *See Citigroup I*, 827 F. Supp. 2d

10   at 330.  In comparing the complaint filed by the S.E.C. against Citigroup with the

11   complaint filed by the S.E.C. against Stoker, the district court noted that

12   "[a]lthough this would appear to be tantamount to an allegation of knowing and

13   fraudulent intent ('*scienter*,' in the lingo of securities law), the S.E.C., for reasons

14   of its own, chose to charge Citigroup only with negligence, in violation of

15   Sections 17(a)(2) and (3) of the Securities Act, 15 U.S.C. § 77q(a)(2) and (3)."  *Id*.

16   The exclusive right to choose which charges to levy against a defendant rests

17   with the S.E.C.  *See, e.g., United States v. Microsoft Corp.*, 56 F.3d 1448, 1459 (D.C.

18   Cir. 1995) ("[T]he district court is not empowered to review the actions or

26

1    behavior of the Department of Justice; the court is only authorized to review the

2    decree itself."); *see also Heckler v. Chaney*, 470 U.S. 821, 831 (1985) ("[A]n agency's

3    decision not to prosecute or enforce, whether through civil or criminal process, is

4    a decision generally committed to an agency's absolute discretion.").  Nor can the

5    district court reject a consent decree on the ground that it fails to provide

6    collateral estoppel assistance to private litigants—that simply is not the job of the

7    courts.

8          Finally, we note that to the extent that the S.E.C. does not wish to engage

9    with the courts, it is free to eschew the involvement of the courts and employ its

10   own arsenal of remedies instead.  *See, e.g.,* Exchange Act § 21C(a), 15 U.S.C.

11   § 78u-3(a); Securities Act § 8A(a), 15 U.S.C. § 77h-1(a).   The S.E.C. can also order

12   the disgorgement of profits.  Exchange Act § 21B(e), 15 U.S.C. § 78u-2(e);

13   Securities Act § 8A(e), 15 U.S.C. § 77h-1(e).  Admittedly, these remedies may not

14   be on par with the relief afforded by a so-ordered consent decree and federal

15   court injunctions.  But if the S.E.C. prefers to call upon the power of the courts in

16   ordering a consent decree and issuing an injunction, then the S.E.C. must be

17   willing to assure the court that the settlement proposed is fair and reasonable.

18   "Consent decrees are a hybrid in the sense that they are at once both contracts

27

and orders; they are construed largely as contracts, but are enforced as orders."

*Berger v. Heckler*, 771 F.2d 1556, 1568-69 (2d Cir. 1985) (citation omitted).  For the

courts to simply accept a proposed S.E.C. consent decree without any review

would be a dereliction of the court's duty to ensure the orders it enters are

proper.

## CONCLUSION

For the reasons given above, we vacate the November 28, 2011 order of the

district court and remand this case for further proceedings in accordance with

this opinion.   As we exercise jurisdiction pursuant to Section 1292(a)(1), the

petition for a writ of mandamus is denied as moot.

28